Argued and submitted July 17, 2013, reversed in part and remanded
May 21, 2014

CITY OF EUGENE,
an Oregon municipal corporation,
*Plaintiff-Appellant,*

*v.*

COMCAST OF OREGON II, INC.,
an Oregon corporation,
*Defendant-Respondent.*

Lane County Circuit Court
160803280; A147114

333 P3d 1051

Susan D. Marmaduke argued the cause for appellant. With her on the briefs were William F. Gary, Sivhwa Go, Jona Maukonen, and Harrang Long Gary Rudnick PC.

Timothy R. Volpert argued the cause for respondent. With him on the briefs was Davis Wright Tremaine LLP.

Before Duncan, Presiding Judge, and Wollheim, Judge, and Schuman, Senior Judge.

SCHUMAN, S. J.

## SCHUMAN, S. J.

This case involves a dispute between the City of Eugene and Comcast of Oregon II, Inc. (Comcast) over whether the city can impose certain fees on revenue that Comcast earned by providing broadband Internet service in Eugene. According to the city, Comcast's broadband Internet service is a "telecommunications service" under the city's telecommunications ordinance, and the city is therefore entitled to collect a two-percent registration fee and seven-percent license fee that the ordinance imposes on gross revenues derived from telecommunications services within the city. Comcast, for its part, claims that the definition of "telecommunications services" in the ordinance was never intended to include Internet access services and, further, that the city has discriminated against Comcast by treating it differently from all other Internet access service providers in Eugene. The trial court agreed with Comcast for the most part, ruling that its broadband Internet services were not "telecommunications services" under the ordinance and, alternatively, that the city's enforcement of the ordinance against Comcast would violate the federal Internet Tax Freedom Act (ITFA) and state and federal constitutional protections. For the reasons that follow, we affirm the trial court's judgment with respect to the registration fee, collection of which is barred by the ITFA, but we reverse and remand with respect to collection of the license fee.

## I.  BACKGROUND

We will reserve some discussion of the facts for a more focused treatment of particular assignments of error, but we provide the following general background to frame the issues on appeal. We take the facts from the trial court's findings, which the parties do not challenge on appeal, and we supplement them with the undisputed regulatory backdrop and procedural history of the case.[1] Because the sequence of events is relevant, we set out the facts in roughly chronological order.

---

[1] In addition to making explicit factual findings, the trial court also adopted a set of stipulated findings that the parties submitted jointly.

## A. Regulatory Background

### 1. Comcast is granted a cable franchise in Eugene.

In 1991, the City of Eugene granted Comcast a non-exclusive franchise to develop, install, and operate a cable communications system in the city's rights-of-way.[2] The franchise called for Comcast to pay the city a fee in the amount of five percent of Comcast's revenue from services within the franchise area. Pursuant to the franchise, Comcast provided cable television services in Eugene and paid the city the five-percent franchise fee on revenue derived from those television services.

### 2. Congress passes the Telecommunications Act.

In 1996, Congress passed the Telecommunications Act, which amended the Communications Act of 1934 (collectively, "the Act"). The Act imposes common-carrier duties on providers of "telecommunications service," 47 USC § 153(51),[3] but not on providers of "information service." The Act defines "telecommunications service" as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." 47 USC § 153(53). It then defines the term "telecommunications" as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 USC § 153(50). "Information service," by contrast, is defined as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications." 47 USC § 153(24).

---

[2] The franchise was granted to Comcast's predecessor in interest, TCI Cablevision of Oregon, Inc. (TCI). TCI merged with AT&T in 1998, creating AT&T Broadband, and TCI's rights under the franchise were assigned to AT&T Broadband, which later assigned its rights under the franchise to Comcast. To avoid unnecessary confusion, we generally do not distinguish in this case between Comcast and its predecessors.

[3] As a result of amendments over the years, many provisions in the Act have been renumbered. For ease of reference, we use the numbering in the current version of the Act.

### 3. *Eugene adopts its telecommunications ordinance.*

That same year, 1996, the Eugene City Council adopted its Telecommunications Vision and Policies. As described in that document, the city envisioned a "coordinated regional information infrastructure that provides accessible and affordable high-speed connectivity for citizens, public institutions, and businesses and is constructed in a manner that best serves the public interest." The city identified, as one of its policies, that "[p]ublic inconvenience and disruption stemming from the installation, maintenance, and operation of telecommunications facilities shall be minimized and fully compensated."

The following year, in April 1997, the city council adopted the ordinance at issue in this case, Ordinance No. 20083 ("the ordinance" or "telecommunications ordinance"). The ordinance imposes two fees that are relevant here. First, the ordinance requires "operators"—*i.e.*, those "who provide[] telecommunications services"—to register with the city and pay an annual registration fee of two percent of revenues for those telecommunications services. Eugene City Code (ECC) 3.005; ECC 3.405; ECC 3.415(1). Second, the ordinance requires operators to obtain a license before locating any facility in the city right-of-way to "[c]onstruct a telecommunications facility or provide telecommunications service." ECC 3.410. Operators who are required to obtain a license must pay an annual license fee "in the amount of 7% of the licensee's gross revenues derived from telecommunications activities within the city, to compensate the City for the use of the rights-of-way." ECC 3.415(2). The license fee is separate from, and in addition to, the registration fee.

As described above, both the license fee and registration fee apply to providers of "telecommunications services." The ordinance includes the following definition of that term:

"Telecommunications services. The transmission for hire, of information in electromagnetic frequency, electronic or optical form, including, but not limited to, voice, video, or data, whether or not the transmission medium is owned by the provider itself, and whether or not the transmission medium is wireline or wireless. Telecommunications service includes all forms of telephone services and voice, data

and video transport, but does not include: (1) cable [television] service; (2) OVS service; (3) private communications system services; (4) over-the-air radio or television broadcasting to the public-at-large from facilities licensed by the Federal Communications Commission or any successor thereto; and (5) direct-to-home satellite service within the meaning of Section 602 of the Telecommunications Act of 1996."

ECC 3.005.

Both before and after the ordinance was adopted, there were questions as to whether it was intended to reach Internet service providers (ISPs), which, at that point in time, were predominantly "dial-up" ISPs that depended on local telephone companies to transmit signals. During a public hearing on whether the city council should adopt the ordinance, the general manager of one of those dial-up ISPs, Eugene FreeNet, asked city council members to address whether the proposed amendments would apply to Internet service providers. Randy Kolb, who was the staff lead to the council committee that developed the ordinance, responded at the hearing by stating that Internet service providers would not be affected by the proposed fees. One of the council members then requested that the language of the ordinance be amended to make it clear that Internet service providers would not be affected by the ordinance, but no such amendments were made.[4]

After the ordinance was adopted, a city employee prepared a "white paper" to guide the city's application of the ordinance. The white paper, which was reviewed by the city's legal counsel, stated in its first paragraph that "Internet and radio/television broadcasting are _not_ applicable." (Emphasis in original.)

4. *Congress enacts the Internet Tax Freedom Act.*

Around the same time that the City of Eugene was adopting its telecommunications ordinance, Congress was

---

[4] Kolb reviewed proposed language and determined that no amendments were necessary. At trial, he testified that, to the best of his recollection, he concluded that no clarification was necessary because the ISPs did not operate telecommunications facilities in the city.

addressing the specific question of taxation of the Internet. In 1998, one year after the city adopted its telecommunications ordinance, Congress enacted the ITFA, codified in a note following 47 USC § 151. The ITFA, in oversimplified terms, does two things. First, it prevents state and local governments from imposing "taxes on Internet access, unless such tax was generally imposed and actually enforced prior to October 1, 1998." ITFA § 1101(a)(1). Second, the ITFA prohibits state and local governments from imposing "multiple or discriminatory taxes on electronic commerce." *Id.* at § 1101(a)(2).

In February 1999, the city's employees, including Kolb and Pam Berrian, who was the city's telecommunications and cable program manager, submitted a report to the Eugene City Council that addressed the status of the telecommunications ordinance and, in particular, mentioned the newly enacted ITFA. The report states that the subject of "Internet taxation" had been capturing attention on several fronts, but that "[t]hat issue will not be discussed here since Ordinance 20083 (the telecommunications ordinance.) is not inclusive of Internet activities."

5. *Comcast begins offering broadband Internet service in Eugene.*

On October 26, 1999, Comcast began providing cable modem service, a broadband Internet access service, to customers in Eugene. The technical aspects of that service will be discussed later in more detail, but Comcast essentially provides its subscribers with Internet access by delivering Internet Protocol (IP) packets to and from the Internet and by providing an associated set of services, such as assigning IP addresses. Unlike the dial-up ISPs that preceded it, which depended on transmission facilities owned by other providers (such as telephone companies) to deliver IP packets, Comcast owns its own transmission facilities—*i.e.*, the cable lines that it used to provide cable television under its franchise agreement with the city. Beginning in 1999, when it began providing broadband Internet services, Comcast paid a five-percent fee on those services pursuant to the franchise agreement. That changed in 2002, however,

as the result of a ruling by the Federal Communications Commission (FCC).

6. *The FCC rules that cable modem services are not telecommunications services.*

Although Comcast did not begin providing cable modem services in Eugene until 1999, questions had arisen elsewhere over whether cable modem services were "telecommunications services" or "information services" for purposes of the 1996 Federal Telecommunications Act. In 2002, the FCC issued a declaratory ruling in which it concluded that cable modem services are *not* "telecommunications services" under the Act. *In re Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, 17 FCC Rcd 4798 (2002). (As we will later discuss, the United States Supreme Court eventually held that the FCC's interpretation of the Telecommunications Act was a reasonable one and was therefore entitled to deference. *Nat'l Cable & Telecomm. v. Brand X*, 545 US 967, 125 S Ct 2688, 162 L Ed 2d 820 (2005).) In the wake of the FCC's 2002 declaratory ruling, Comcast stopped paying any franchise fees to the City of Eugene for cable modem services and, from that point forward, rebuffed the city's assertions that franchise fees were owed on those services.

B. *Procedural History*

1. *The city attempts to enforce its ordinance against Comcast.*

Comcast and the city entered into a new franchise agreement, effective November 2007. A few months later, the city filed its complaint in this action to collect fees based on Comcast's cable modem services. However, this time, the city was not seeking to collect under the franchise agreement, but, rather, based on the city's telecommunications ordinance. That is, the city alleged, among other things, that Comcast owed the two-percent registration fees and the seven-percent license fees under the ordinance dating back to 1999, when Comcast began providing cable modem services in Eugene.

2. *The trial court rules that cable modem services are "telecommunications services" under the city's ordinance and rejects Comcast's arguments that the registration and license fees are barred as a matter of law by the ITFA.*

The parties filed cross-motions for summary judgment with respect to various issues raised by the city's complaint, including whether cable modem services are within the definition of "telecommunications services" in the ordinance. That question, in turn, reduced to whether Comcast engaged in "transmission for hire"—part of the definition of "telecommunications services"—when providing cable modem services. The trial court ruled in the city's favor on that question, applying dictionary definitions of "transmission" and "for hire" to conclude that, by sending and receiving signals for remuneration, Comcast had engaged in "transmission for hire" and, consequently, had provided telecommunications services subject to the ordinance.

Alternatively, Comcast argued that, even if the ordinance were to apply to its cable modem services, then the registration and license fees are barred by the ITFA's tax moratorium and ban on discriminatory taxes; the license fees are franchise fees and therefore preempted by a provision of the federal Cable Act, 42 USC § 542(b); the franchise agreement excuses Comcast from obtaining a right-of-way and paying the license fees; and the city's selective enforcement of the ordinance violates constitutional protections against discriminatory treatment. The trial court ruled as a matter of law against Comcast on the bulk of those issues, leaving two questions for trial: (1) whether the annual registration fees had been generally collected before October 1, 1998, thereby excepting them from the moratorium on Internet taxes; and (2) whether the city, in enforcing the ordinance against Comcast but not other ISPs, had discriminated against Comcast in violation of state and federal constitutional protections.

3. *Comcast offers expert testimony at trial regarding Internet access services.*

The parties then proceeded to trial before the court on those two remaining questions. The city offered testimony

by Kolb and Berrian to explain why the city had attempted to collect registration and license fees from Comcast but not other ISPs. Kolb explained that the city was not interested in "things like modems, which merely translate analog to digital," but rather was "always after the physical lines that existed in the city of Eugene and in the radio communications that were located in the city of Eugene that carried this traffic. * * * We were interested in the highway."

Among its witnesses, Comcast called Dale Hatfield, an expert in the field of telecommunications. Hatfield explained that Internet access service is provided by using "transmission service," but that Internet access service is not *itself* transmission service. He used the analogy of train transportation. The "transmission facility," he testified, "would be the rail bed." The transmission service "might be the engine and flatbed cars," and the "Internet packets would be those shipping containers that go onto the flatbed." According to Hatfield, Kolb's description, by way of related analogy, of what the city intended to tax—the highway—was separate and apart from the Internet access service that rides on top of the highway.

4. *The trial court reconsiders its ruling and changes course.*

After the parties put on their respective cases, Comcast asked the court to reconsider its summary judgment rulings in light of the development of the record at trial. Primarily, Comcast asked the court to reconsider its earlier ruling that cable modem services involved "transmission for hire" under the ordinance. Comcast argued that the court had erred in relying on the ordinary meanings of "transmission" and "for hire," because "transmission for hire" is a term of art in the telecommunications industry, as demonstrated by Hatfield's testimony.

The trial court agreed with Comcast and, over the city's objection, reconsidered its earlier interpretation of the ordinance. This time, rather than look to the ordinary meanings of the terms "transmission" and "for hire," the court looked to Hatfield's testimony and the meaning of "telecommunications" under state and federal laws. The court

ultimately "adopt[ed] Mr. Hatfield's testimony and conclud[ed] that Internet access is not a transmission for hire in the telecommunications industry, and thus cable modem access is not subject to the Ordinance." The court further reasoned that "telecommunications" should mean the same thing under the ordinance as it does under state and federal laws, notwithstanding the fact that those laws use language different from the ordinance. The court explained:

> "This Court is persuaded that telecommunications services in Eugene should be defined in the same way as the Oregon Legislature and Congress define telecommunications services. Although, Eugene's Ordinance defined telecommunications very broadly, this Court does not understand telecommunications to be different in Eugene than it is in the rest of the country. Thus, in Eugene, Comcast is not offering a 'transmission for hire' when it offers Internet access, but is offering the end product of data manipulation."

Although the trial court's ruling regarding application of the ordinance was dispositive, the court nonetheless proceeded to address other issues to avoid the necessity of a remand after appeal. The court declined to reconsider its ruling that the license fee was not a tax under the ITFA, but did reconsider the legality of the registration fee under that statute, concluding that it was discriminatory and therefore barred by the ITFA. As for the two issues that had been set for trial, the court ruled that the registration fee had not been generally collected from Internet access providers before October 1, 1998, and was therefore barred by the ITFA for that reason as well. Additionally, the court concluded that, for purposes of the state and federal constitutions, "Comcast has demonstrated an intentional and systematic pattern of discrimination by the City because the City has not collected the registration or license fees on Internet access revenues of other providers that are subject to the Ordinance under the City's interpretation." The court then entered a judgment in Comcast's favor that incorporated the court's letter opinion.

5. *The city appeals; Comcast cross-assigns error.*

The city now appeals, advancing five assignments of error. Those assignments raise three general issues: whether the court erred in ruling that (1) the ordinance did not apply

to Comcast's cable modem services; (2) the registration fee is barred by the ITFA; and (3) the imposition of the registration and license fee violated Comcast's rights under Article I, section 32, of the Oregon Constitution or the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Comcast defends the court's rulings and asserts cross-assignments of error in which it argues that the license fee is unenforceable for three additional reasons that the trial court rejected: (1) the license fee is barred by the ITFA; (2) the license fee is preempted by 47 USC § 542; and (3) the license fee is barred by ECC 3.410(6).

## II. ANALYSIS

### A. *Are Cable Modem Services "Telecommunications Services" under the Ordinance?*

In its first assignment of error, the city challenges the trial court's ruling that cable modem services are not "telecommunications services" within the meaning of the ordinance. In the city's view, the trial court was swayed by two sources—Hatfield's testimony and the definitions of "telecommunications" under state and federal statutes—that have little to no bearing on the meaning of the city's ordinance. For the reasons that follow, we agree with the city.

Our aim in construing a local ordinance is the same as when construing a statute: to discern the intent of the body that promulgated the law. Thus, we follow the same method that we ordinarily employ to determine the meaning of a statute, examining the text, context, and helpful legislative history of the provision in dispute, and, if necessary, turning to maxims of construction. *See State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009) (setting out the method for statutory interpretation); *Lincoln Loan Co. v. City of Portland*, 317 Or 192, 199, 855 P2d 151 (1993) (applying statutory construction template to a municipal ordinance); *Comcast of Oregon II, Inc. v. City of Eugene*, 211 Or App 573, 584, 155 P3d 99 (2007), *aff'd on other grounds*, 346 Or 238, 209 P3d 800 (2009) (examining the text of the Eugene City Code by the same method prescribed for statutory interpretation).

The starting point, then, is the text of the disputed provision, ECC 3.005, which sets forth the definition of "telecommunications services." That definition, once again, states:

"Telecommunications services. The transmission for hire, of information in electromagnetic frequency, electronic or optical form, including, but not limited to, voice, video, or data, whether or not the transmission medium is owned by the provider itself, and whether or not the transmission medium is wireline or wireless. Telecommunications service includes all forms of telephone services and voice, data and video transport, but does not include: (1) cable [television] service; (2) OVS service; (3) private communications system services; (4) over-the-air radio or television broadcasting to the public-at-large from facilities licensed by the Federal Communications Commission or any successor thereto; and (5) direct-to-home satellite service within the meaning of Section 602 of the Telecommunications Act of 1996."

The parties agree that we should focus on the first four words of the definition—"the transmission for hire"—but from there, their approaches diverge. Whereas the city urges us to look at the plain meaning of those words, Comcast argues that the trial court correctly understood "transmission for hire" as a term of art in the telecommunications industry.

Generally, when an enacting body like a city council has not defined a term used in its law, we assume that the body used words consistently with their ordinary meanings. *See Zimmerman v. Allstate Property and Casualty Ins.*, 354 Or 271, 279-80, 311 P3d 497 (2013) (describing that rule in the context of statutory interpretation). However, if "the term has acquired a specialized meaning in a particular industry or profession," we assume that the enacting body "used the term consistently with that specialized meaning." *Id.* at 280. Thus, the first question before us is whether "transmission for hire" is a term that has acquired a specialized meaning in the telecommunications industry.

In support of its position that "transmission for hire" is a term of art, Comcast points to the testimony of its expert, Hatfield. The trial court relied heavily on that testimony as well, stating that "Hatfield, an expert in the field

of telecommunications, *has testified to the industry defini-tions of 'transmission for hire' and telecommunications does not include cable modem service.*" (Emphasis added.) But, as the city correctly observes, Comcast and the trial court read Hatfield's testimony for more than it is worth.

Because it is central to the parties' argument, we quote much of Hatfield's testimony at length. Hatfield, who had decades of experience in the telecommunications indus-try, was initially called upon to testify concerning "how providers of Internet access service utilize telecommuni-cations facilities within the city of Eugene."[5] Hatfield pro-ceeded to explain that various ISPs—dial-up, cable modem, DSL, dedicated digital line, and wireless—use different types of transmission facilities, but each performs the same basic function: delivering information packets to and from the Internet. Hatfield prepared various diagrams, includ-ing Exhibit D42, which charted the delivery of those pack-ets by different types of ISPs. For each type of access, the exhibit showed, from left to right, the computer and modem; the local transmission facility; the physical location of the Internet access provider's facilities ("Point of Presence"); the dedicated high capacity transmission facility; and the Internet.[6] Hatfield explained that Internet access can be broken into different "layers" or tiers. He used the analogy, to which we alluded above, of rail transportation: The trans-mission facility is like the rail bed and tracks; the trans-mission service is like an engine and flatbed cars; and the Internet packets are like shipping containers that ride on flatbed cars. Thus, he testified, "the Internet is a network that rides on top and takes advantage of these transmission facilities, and so there's high-capacity transmission facilities that you can get from any number of carriers," emphasizing

[5] First, Comcast's counsel asked Hatfield to testify about "any specific expert opinions regarding the issues in this case[.]" After an objection from the city, Comcast's counsel stated, "Your honor, these are not opinions on the law. These are opinions on facts *on how Internet access is provided in the city of Eugene.*" (Emphasis added.) After the court questioned whether that would be of any assis-tance to it, Comcast's counsel assured the court that Hatfield would be describing "how providers of Internet access service utilize telecommunications facilities within the city of Eugene."

[6] In the case of the dedicated digital line, there are high capacity transmis-sion facilities on both sides of the point-of-presence.

that "the Internet is something that rides on top of, that can use all types of different capacity."

After Hatfield testified, Kolb testified for the city. Kolb had prepared his own version of Exhibit D42, which highlighted the local transmission facilities and dedicated high-capacity transmission facilities that were depicted on that exhibit. Kolb testified that he highlighted "the telecommunications lines, be they physical lines like fiber or copper or coaxial or radio communications, that are located within the city of Eugene." When asked why he had excluded the "so-called point-of-presence," he explained that the city was not interested "in things like modems [located at the point-of-presence], which merely translate analog to digital," but that the city was "always after the physical lines that existed in the city of Eugene and in the radio communications that were located in the city of Eugene that carried this traffic. * * * We were interested in the highway."[7]

Comcast later re-called Hatfield to the stand, and he was asked about Kolb's diagram. The following colloquy ensued:

"Q. [COMCAST'S COUNSEL]: Now, sticking with Mr. Kolb's diagram, the services that Mr. Kolb indicates the City did intend to tax are the transmission services that are highlighted. *Now, in common industry parlance, are those what—are those transmission services traditionally known as telecommunications services?*

"A. [HATFIELD]: *Yes, they would be telecommunications services.* As I tried to explain yesterday, the Internet then rides upon—using that layered model, they ride upon those transmission facilities or services.

"Q. *And once again, in common industry parlance, are those transmission services that are highlighted there on Mr. Kolb's diagram considered Internet access service?*

"A. *No.* As I tried to—

"THE COURT: Stop, stop. You said transmission services.

"[COMCAST'S COUNSEL]: Yes.

---

[7] In addition to his railroad analogy, Hatfield had likened the "transport layer" of communications to a highway.

"THE COURT:  The diagram says transmission facilities. Is there any distinction to be made there?

"[HATFIELD]:  As an engineer, I would make the distinction. The transmission facility is the actual physical electrical equipment that's used. But that can be used for lots of different services."

(Emphasis added.)

Hatfield then offered further testimony on "common industry parlance":

"Q. [COMCAST'S COUNSEL]:  So now, *in common industry parlance*, are those transmission services that you just discussed with the Judge and that are highlighted on Mr. Kolb's diagram there considered Internet access service?

"A.  *No. As I was trying to say, the Internet access is just but one service that could use that transmission service * * *.*"

(Emphasis added.)

Hatfield explained that Comcast does not offer separate, stand-alone transmission service between the customer's premises and Comcast's point-of-presence. Rather, as a result of the FCC's 2002 declaratory ruling described above, cable modem companies can "combine the telecommunications portion, if you will, with the Internet access portion *into a single offering*." (Emphasis added.) He later returned to the subject of Kolb's diagram, explaining that it did not actually highlight Internet access revenues:

"Q.  So you were here and you heard what Mr. Kolb testified to yesterday, that they only wanted to get—they only wanted to tax the transmission services that are highlighted there. But also implicit in his testimony is that they wanted to capture Internet access revenues.

"Now, given what he's done there [with highlighting], does that make any sense? Are you taxing Internet service revenues there?

"A.  *No. When I heard * * * the testimony, that was my reaction. It captures the telecom part but does not capture the—does not capture the Internet access part.*

"Q.  Now, why is that? Can you explain why?

"A. Well, for the reason—the reason that I just described. Without this link in here (indicating), you couldn't have packets moving back and forth across that network, going back to the layer sort of description and the analogies that I've given here this afternoon."

(Emphasis added.)

Based on the foregoing testimony, we conclude that, despite being asked about certain "industry parlance," Hatfield did not actually offer a technical or industry meaning of the terms used in the ordinance—"transmission for hire." Hatfield testified to the technical distinction in the telecommunications industry between transmission services and Internet access services and the effect of the FCC's ruling. The question for purposes of the ordinance, though, is not whether Internet access services are transmission services, or whether Comcast offers stand-alone transmission services. Rather, the question is whether Comcast's *cable modem services* are "transmission for hire."

Hatfield did not testify that "transmission for hire" or, for that matter, "transmission," is a term of art in the telecommunications industry. While "transmission services" might be understood to be distinct from Internet access services, Hatfield also testified that transmission of data is a necessary component of Internet access, and that cable modem services are a combined offering that transmits data over telecommunications facilities. That is, unlike some other types of ISPs, when Comcast provides cable modem services, it provides Internet access services by *transmitting data, over its own cable lines, to and from the Internet.* Hatfield's testimony, which conveys the industry's understanding of the technical layers involved in providing Internet access, says nothing about whether the city, by using the phrase "transmission for hire," intended to capture revenue from a provider whose combined offering, like Comcast's cable modem services, necessarily includes the transmission of data to and from the Internet over its own transmission facilities.[8] Thus, the court erred in treating

---

[8] To the extent that Comcast suggests that "telecommunications services," as opposed to "transmission for hire," is a term of art, we reject the contention. We will not give words their industry (or common) meaning when those words are specifically defined in the law itself, as is the case with "telecommunications

"transmission for hire" as a term of art based on Hatfield's testimony.[9]

The trial court, however, offered an alternative reason for looking beyond the ordinary meaning of "transmission for hire." The court, on reconsideration, was "persuaded to consider federal legal definitions and interpretations" of the Federal Telecommunications Act, which had excluded cable modem services from the definition of "telecommunications services." The court observed that the city's ordinance was adopted with knowledge, and in consideration, of the Act, and ruled that there was "no reason to define cable modem access as a transmission in Eugene, when federal law has determined that cable modem access is not a separate transmission."

There are, as the city identifies, two fundamental problems with that approach. First, as noted before, timing matters. The classification of cable modem services under the Act would provide relevant context for interpreting the city's ordinance only if the city could have known about it at the time the ordinance was adopted. *See Holcomb v. Sunderland*, 321 Or 99, 105, 894 P2d 457 (1995) (proper inquiry in interpreting a law focuses on what the legislature intended at the time of enactment). Although the Act itself predated the city's ordinance, it was the FCC's interpretation of that Act—and the Supreme Court's decision in *Brand X*, affirming the FCC's ruling—that the trial court ultimately found persuasive regarding the meaning of the city's ordinance. The FCC's interpretation of the Act *vis-à-vis* cable modem services, which it expressed in the declaratory ruling, was not issued until 2002, five years after the city adopted its ordinance. The Supreme Court's decision in *Brand X* did not issue until three years after that. Thus, the city council could not have been aware of either interpretation when crafting its own ordinance.

services." Moreover, as we later discuss, the definitions of "telecommunications services" in other contexts provide little help in interpreting the language of the ordinance, which differs significantly from those other definitions.

[9] Because we agree with the city that Hatfield did not actually testify that "transmission for hire" is a term of art, we need not resolve the parties' dispute as to whether expert testimony is a permissible way to establish the meaning of a term of art.

Second, and most important, the Act defines "tele-communications services" with language that is materially different from the definition in the city's ordinance. The Act defines "telecommunications service" as "the offering of tele-communications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." 47 USC § 153(53). It then defines "telecommunications" as "the transmission, between or among points specified by the user, of infor-mation of the user's choosing, *without change in the form or content of the information as sent and received.*" 47 USC § 153(50) (emphasis added). The ordinance, by contrast, makes no reference to whether there is change in the form or content of the information that is sent. Rather, as set out more fully above, 263 Or App at 128, the ordinance defines "telecommunications" broadly as "[t]he transmission for hire, of information in electromagnetic frequency, electronic or optical form, including, but not limited to, voice, video, or data, whether or not the transmission medium is owned by the provider itself, and whether or not the transmission medium is wireline or wireless." If anything, the fact that Eugene's city council was aware of (and referred to) the Telecommunications Act but employed its own definition of "telecommunications services," suggests that the city council intended a different meaning for its ordinance. *E.g., Schmitt v. State Tax Com.*, 234 Or 455, 464, 383 P2d 97 (1963) (infer-ring that differences between state and federal statutes rep-resented a purposeful departure from federal law where "[t] he most reasonable interpretation is that the drafters of the [state] act were familiar with the use of the phrase in the federal act * * * [and] were also familiar with the importance the federal government had placed on that phrase").

Indeed, it was language that appears in the Telecommunications Act—and not in the city's ordinance—that ultimately drove the FCC's conclusion that cable modem services are not "telecommunications services." As relevant here, the Act creates two categories of regulated entities: telecommunications carriers and information-service pro-viders. Telecommunications carriers are regulated as com-mon carriers, which requires them to charge just and rea-sonable, nondiscriminatory rates, 47 USC §§ 201-209, design

their systems so that other carriers can interconnect with their networks, *id.* at § 251(a)(1), and contribute to the federal "universal service" fund, *id.* at § 254(d). Information-service providers, on the other hand, are not subject to those common-carrier regulations.

In April 1998, the FCC issued a report to Congress regarding implementation of the Act. In that report (the "Universal Service Report"), the FCC addressed the definitions of "telecommunications service," "telecommunications," and "information service" as they relate to Internet access. *In the Matter of Federal-State Joint Board on Universal Service,* 13 FCC Rcd 11501 (1998). At that time, Internet access services were typically provided through a "dial up" connection that involved transmission of information over local telephone lines. In the Universal Service Report, the FCC assumed that ISPs generally are separate from the telecommunications companies that are transmitting the data across telephone lines, but suggested that a different model might require a different approach. The report states, in part:

> "[W]e clarify that the provision of transmission capacity to Internet access providers and Internet backbone providers is appropriately viewed as 'telecommunications service' or 'telecommunications' rather than 'information service,' and that the provision of such transmission should also generate contribution to universal service support mechanisms. Thus, we find, in general, that continued growth in the information services industry will buttress, not hinder, universal service. *In those cases where an Internet service provider owns transmission facilities, and engages in data transport over those facilities in order to provide an information service, we do not currently require it to contribute to universal service mechanisms. We believe it is appropriate to reexamine that result, as one could argue that in such a case that the Internet service provider is furnishing raw transmission capacity to itself.* We recognize, however, that there are significant operational difficulties associated with determining the amount of such an Internet service provider's revenues to be assessed for universal service purposes and with enforcing such requirements. We intend to consider these issues in an upcoming proceeding. *Finally, we find that Internet service providers generally do not provide telecommunications.*"

13 FCC Rcd at 11508-59 (emphasis added). With regard to the distinction between telecommunications and information services, the report further states:

> "The provision of Internet access service involves data transport elements: an Internet access provider must enable the movement of information between customers' own computers and the distant computers with which those customers seek to interact. But the provision of Internet access service crucially involves information-processing elements as well; it offers end users information-service capabilities inextricably intertwined with data transport. As such, we conclude that it is appropriately classed as an 'information service.'"

*Id.* at 11539-40. Thus, shortly after the city's adoption of its telecommunications ordinance in 1997, the FCC in 1998 had indicated that ISPs generally provide information services rather than telecommunications, but also identified the need to reexamine that approach in "a case that the Internet service provider is furnishing raw transmission capacity to itself." *Id.* at 11508.

Two years later, in *AT&T Corp. v. City of Portland,* 216 F3d 871 (9th Cir 2000), the Ninth Circuit confronted the question raised but not definitively answered in the Universal Service Report: how to deal with Internet service providers who own their own transmission facilities. The court ruled that AT&T's cable modem service, unlike a "dial up" service, was providing "telecommunications services":

> "Like other ISPs, @Home [AT&T's service] consists of two elements: a 'pipeline' (cable broadband instead of telephone lines), and the Internet service transmitted through that pipeline. However, unlike other ISPs, @Home controls all of the transmission facilities between its subscribers and the Internet. To the extent @Home is a conventional ISP, its activities are that of an information service. *However, to the extent that @Home provides its subscribers Internet transmission over its cable broadband facility, it is providing a telecommunications service as defined in the Communications Act.*"

216 F3d at 878 (emphasis added).

In the wake of the decision in *AT&T Corp.* (and conflicting decisions in other jurisdictions[10]), the FCC initiated a rulemaking proceeding to address whether broadband Internet services provided by cable companies should be classified as "telecommunications services" or as "information services" under the Act. In 2002, the FCC issued its declaratory ruling stating that cable modem services are *not* "telecommunications services" under the Act. 17 FCC Rcd 4798.

Various parties petitioned for judicial review of the declaratory ruling, and the Ninth Circuit was selected as the venue for the challenge. Relying on the principle of *stare decisis*, the court held that its earlier conclusion in *AT&T Corp.* was controlling with regard to whether cable modem services were part "telecommunications service," and it vacated the FCC's ruling and remanded for reconsideration.

The Supreme Court granted *certiorari* and, in *Brand X*, reversed the Ninth Circuit. Although the Supreme Court affirmed the FCC's ruling that cable modem services are not "telecommunications services," the reasoning in *Brand X* actually underscores the differences between the Act and the city's ordinance. The Court ultimately upheld the FCC's ruling not based on the well understood meaning of the terms "telecommunications" or "telecommunications services," but on the basis of *Chevron* deference—that is, the principle that federal courts must accept an implementing agency's plausible construction of a statute, "even if the agency's reading differs from what the court believes is the best statutory interpretation." 545 US at 980. In explaining why the FCC's construction of "telecommunications services" was a reasonable one, the Court focused not on whether cable modem services were telecommunications; indeed, the FCC "conceded that, like all information-service providers, cable companies use 'telecommunications' to provide consumers with Internet service; cable companies provide such service via the high-speed wire that transmits signals to and from an end user's computer." 545 US at 988. Rather, the case turned

---

[10] *See In re Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, 15 FCC Rcd 19287, 19292-93 (2000) (describing inconsistent judicial decisions).

on whether cable modem services providers are "offering" those underlying telecommunications within the meaning of the Act. *See* 47 USC § 153(53) (defining "telecommunications services" as the "offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used").

The Court held that, consistent with the FCC's conclusion, "'offering' can reasonably be read to mean a 'stand-alone' offering of telecommunications, *i.e.*, an offered service that, from the user's perspective, transmits messages unadulterated by computer processing." *Id.* at 989. The Court explained:

> "The question, then, is whether the transmission component of cable modem service is sufficiently integrated with the finished service *to make it reasonable to describe the two as a single, integrated offering. See ibid.* We think that they are sufficiently integrated, because '[a] consumer uses the high-speed wire always in connection with the information-processing capabilities provided by Internet access, and because the transmission is a necessary component of Internet access.' *Supra*, at 988. In the telecommunications context, *it is at least reasonable to describe companies as not 'offering' to consumers each discrete input that is necessary to providing, and is always used in connection with, a finished service.* * * * What cable companies providing cable modem service and telephone companies providing telephone service 'offer' is Internet service and telephone service respectively—the finished services, though they do so using (or 'via') the discrete components composing the end product, including data transmission. Such functionally integrated components need not be described as distinct 'offerings.'"

*Id.* at 990-91 (emphasis added).

What that regulatory history demonstrates is that *Brand X* and the FCC's declaratory ruling not only post-dated the adoption of the city's ordinance, but they turned on ambiguous language in the Act that appears nowhere in the city's ordinance. For that reason, we conclude that the trial court erred when, on reconsideration, it relied on the

Act, the FCC's declaratory ruling, and *Brand X* to interpret the city's ordinance.[11]

In our view, the trial court's original interpretation of the ordinance at the summary judgment stage was the correct one. There was no basis to depart from the ordinary meaning of the terms used in the ordinance. The word "transmission," as used in this context, means "an act, process, or instance of transmitting." *Webster's Third New Int'l Dictionary* 2429 (unabridged ed 2002). "Transmit," in turn, means to "send out a signal either by radio waves or over a wire line." *Id.* There is no dispute that Comcast transmits data when it provides cable modem services.

Furthermore, Comcast transmits data "for hire" as part of its cable modem services, under the common meaning of those words. We have observed that, "[i]n common usage, 'for hire' means 'available or offered for rent.' *Webster's* * * * at 892; *see also id.* at 1072 (defining 'hire' and describing the phrase 'for hire' to mean 'available for use or service in return for payment')." *Beaver Creek Coop. Telephone Co. v. PUC (A109890)*, 182 Or App 559, 571, 50 P3d 1231 (2002). In *Beaver Creek Coop. Telephone Co.*, we explained that, "as a matter of common usage, a cooperative is providing telecommunication service on a 'for-hire basis' if it provides those services in exchange for payment." *Id.* Here, Comcast provides its cable modem services, necessarily including transmission of electronic information, in exchange for subscriber fees. Thus, common usage suggests that Comcast's cable modem services are "transmission for hire" of electronic data within the ordinary meaning of those words.

The surrounding text provides additional support for a broader, plain-meaning approach to the term "transmission for hire." The term "transmission for hire" appears in the first sentence of the definition of "[t]elecommunications

---

[11] The trial court also looked to public policy, as demonstrated by the ITFA, and to Oregon's telecommunications laws, which use the same definitions for "telecommunications" and "telecommunications services" as the federal Telecommunications Act. *See* ORS 759.005(8) (defining "telecommunications services" identically to the Telecommunications Act); ORS 759.005(7) (defining "telecommunications" identically to the Telecommunications Act). Neither the ITFA nor Oregon's telecommunications laws had been enacted at the time that the city adopted its ordinance, nor do they use language similar to the city's ordinance.

services"; the second sentence of the definition provides that "[t]elecommunications service includes *all forms* of telephone services and voice, data and video transport" and then enumerates specific exceptions to that definition. (Emphasis added.) Thus, the structure of the definition of "telecommunications services" suggests that "transmission for hire" includes all forms of data transport—including transport as part of a combined offering—unless specifically excluded from the definition.[12]

The broader context of the ordinance likewise suggests that the city intended the ordinance to apply to any transmission of data for which the owner of the transmission facility is being paid. Section 6 of the ordinance adopts attached findings "in support of this Ordinance." Those findings include the following:

"9.     The City and its citizens are entitled to a fair return on their investment in the public right-of-way.

"10.     The compensation required by this ordinance for use of the rights-of-way is authorized by state statute and allowed by federal statute. It compensates the City and its citizens for:

"*accelerated deterioration of streets;

"*the use of a publicly-funded asset by private commercial enterprises;

"*increased complexity of the City's public works projects resulting from the presence of telecommunications facilities in the right-of-way;

"*inconvenience to the public from occupation of the streets by construction crews and equipment; and

"*aesthetic damage to the rights-of-way."

In light of the purpose of the ordinance to compensate the public for private commercial use of the city's rights-of-way, we see no basis for treating "transmission for hire" more narrowly simply because the operator is providing combined

---

[12] At oral argument, Comcast urged us to consider the "reseller" provisions of the ordinance as context that supports its interpretation of "transmission for hire." We are not persuaded by that argument and, as we will discuss later in this opinion, 263 Or App at 147, we disagree with Comcast's understanding of the term "reseller" as defined in the ordinance.

services; the operator is still using the public right-of-way for its private benefit.

Text and context notwithstanding, Comcast urges us to consider a recurring feature of the adoption history of the amendment—namely, assurances from the city that the ordinance was not intended to cover ISPs. Although Kolb and others repeatedly stated that the ordinance did not affect ISPs, the statements must be considered in historical context. Cable modem services did not exist in Eugene at that time, and Internet access was generally provided by traditional "dial-ups," whereby the transmission facilities were not owned by the ISP. Viewed in light of the prevalent technology in Eugene when the city drafted its ordinance, contemporaneous statements about ISPs provide little evidence that the city council intended to narrow the ordinary meaning of "transmission for hire" in a way that would exclude combined offerings of data transport and Internet access services.[13]

Thus, we conclude that the best evidence of the city's intent is the text of the ordinance itself. In its summary judgment ruling, the trial court correctly interpreted the ordinance to apply, based on the plain meaning of the words, to Comcast's cable modem services. It was error for the trial court, on reconsideration, to rule otherwise based on Hatfield's testimony and the FCC's interpretation of the Telecommunications Act.

B. *Does the ITFA Bar the Application of the Ordinance?*

Throughout the litigation, Comcast has argued that, even if its cable modem services are "telecommunications services" under the city's ordinance, the ITFA precludes the city from imposing the license and registration fees on Internet services revenue. The trial court agreed in part with Comcast, concluding that the registration fees

---

[13] The trial court discounted the differences between dial-up Internet access and cable modem service, reasoning that "just because the Internet has evolved, it does not mean that the City can suddenly interpret the Ordinance to include a new type of service. Clearly the intent behind the Ordinance was not to tax Internet access." The question, in our view, is not whether the Internet has evolved, but *how* it has evolved. In this case, the technology has evolved such that Comcast is providing Internet access services by transmitting data over its own telecommunications facilities.

were precluded but that the license fees were not a tax for purposes of the ITFA. We address each of those rulings in turn.

1. *Application of the ITFA to the license fee*

The ITFA, which is summarized above, imposes a moratorium on certain state and local taxes related to the Internet. Section 1101(a) provides:

"Moratorium.—No State or political subdivision thereof shall impose any of the following taxes during the period beginning on October 1, 1998, and ending 3 years after the date of the enactment of this Act—

"(1)   taxes on Internet access, unless such tax was generally imposed and actually enforced prior to October 1, 1998; and

"(2)   multiple or discriminatory taxes on electronic commerce."[14]

The term "tax" is defined in the ITFA to include "any charge imposed by any governmental entity for the purpose of generating revenues for governmental purposes, and is *not a fee imposed for a specific privilege, service, or benefit conferred.*" ITFA § 1104(8)(i) (emphasis added). The trial court reasoned that the license fee—that is, the seven-percent fee that must be paid "as compensation for use of right-of-way," ECC 3.415(2)—is a fee imposed for a specific benefit and therefore not a "tax" for purposes of the ITFA. We agree with the trial court's reasoning and reject Comcast's cross-assignment of error on that issue without further discussion. The ITFA does not bar the city's license fee, which is a fee imposed in exchange for using the city's right-of-way to provide a telecommunications service.

2. *Application of the ITFA to the registration fee*

The two-percent registration fee, however, is a tax under the ITFA. (Indeed, throughout its brief, the city refers to the registration fee as the "business tax.") The trial court ruled that the tax is barred by the ITFA because it (1) is "discriminatory" and (2) even if not discriminatory, is a tax

---

[14] The moratorium was initially set to expire in 2001, but the act has been amended and the moratorium extended—most recently, until November 2014.

on Internet access that had not been generally imposed and actually enforced prior to October 1, 1998. We agree with the trial court's ruling in that latter respect and therefore do not address whether the tax is also discriminatory under the ITFA.

The ITFA expressly defines when a tax on Internet access has been "generally imposed and actually enforced." Section 1101(d) provides:

"*** For purposes of this section, a tax has been generally imposed and actually enforced prior to October 1, 1998, if, before that date, the tax was authorized by statute and either—

"(1)   a provider of Internet access services had a reasonable opportunity to know by virtue of a rule or other public proclamation made by the appropriate administrative agency of the State or political subdivision thereof, that such agency has interpreted and applied such tax to Internet access services; or

"(2)   a State or political subdivision thereof generally collected such tax on charges for Internet access."

In ruling on the parties' summary judgment motions, the trial court concluded that the city had "no rule interpreting and applying the Ordinance to apply to Internet access services," and that paragraph (1) of the statute was therefore inapplicable. The court concluded that questions of fact precluded summary judgment with regard to paragraph (2), so the parties proceeded to trial on whether the city had "generally collected" taxes for Internet access. Following trial, the court ruled that the city had failed to carry its burden of demonstrating that it generally collected taxes for Internet access.

On appeal, the city confines its argument to paragraph (1) of the statute, arguing that Comcast had a "reasonable opportunity to know" of the taxes on its cable modem services by virtue of the ordinance itself, as well as the rules promulgated under the ordinance. According to the city,

"[n]ot only did the Ordinance clearly proclaim that it covers all 'transmission for hire, of information *** including

\* \* \* voice, video or data.\* \* \* wireline or wireless,' and 'all forms of \* \* \* voice, data and video transport,' but the City promulgated rules under the Ordinance that reiterated its definitions."

The city understates the "public proclamation" that the ITFA requires. It is not enough that the language of its ordinance, or even its rules, might be broad enough to encompass Internet access services. Rather, under the ITFA, a "rule or public proclamation" must give the provider of Internet access a reasonable opportunity to know that the "agency *has interpreted and applied such tax to Internet access services*." ITFA § 1101(d)(1) (emphasis added). The city cannot point to any public proclamation that, as of October 1, 1998, provided notice that the city "interpreted and applied" its tax to Internet access services.

In fact, as we explained earlier when discussing the legislative history of the ordinance, the city repeatedly said the opposite: that the ordinance did not apply to Internet access services. At a public hearing on the ordinance, Kolb stated that Internet service providers would not be affected by the proposed fees. The city's "white paper," which it generated shortly after the ordinance was enacted, stated in its first paragraph that "Internet and radio/television broadcasting are _not_ applicable." Although we did not find those statements to be helpful indicators of the city's legislative intent with respect to Comcast's cable modem services, a type of Internet access services that did not exist in Eugene when the ordinance was enacted, *see* 263 Or App at 141, the city's actions and pronouncements surrounding the adoption of the ordinance are flatly inconsistent with its suggestion that it had "interpreted and applied" its registration fee to Internet access services, let alone publicly communicated that to Internet access services providers.[15]

---

[15] The city also argues that Comcast's predecessor, TCI, had actual notice that the tax would apply to cable modem services, as demonstrated by a comment that TCI made in response to the rules promulgated by the city manager. Suffice it to say that the comment, which mentions the potential for dual-use technologies, "including voice, internet, and data transfer," does not demonstrate actual notice that the city intended to apply the registration fee to cable modem services, which were not being offered in Eugene at that time and are not referenced anywhere in the city's response to the comment or the rules themselves.

For that reason, we conclude that the trial court's alternative ruling regarding the registration fee was correct. The fee is a tax on Internet access that was not generally imposed and actually enforced prior to October 1, 1998. Accordingly, the tax is barred by the ITFA.

C. *Does the City's Attempt to Collect the License Fee Discriminate against Comcast in Violation of Article I, Section 32, of the Oregon Constitution and the Equal Protection Clause?*

Having concluded that the registration fee is barred, we turn to the question whether the city has selectively enforced the license fee in violation of state and federal constitutional protections. Under Article I, section 32, "all taxation shall be uniform on the same class of subjects within the territorial limits of the authority levying the tax." Thus, "[t]he taxing authorities may not single out one taxpayer for discriminatory, or selective, enforcement of a tax law that should apply equally to all similarly situated taxpayers." *Penn Phillips Lands v. Tax Com.*, 247 Or 380, 385-86, 430 P2d 349 (1967). The Equal Protection Clause provides similar protection, making it unconstitutional for a state to "deny to any person within its jurisdiction the equal protection of the laws." Oregon courts have employed the same analysis under Article I, section 32, and the Equal Protection Clause. *See Kane v. Tri-Co. Metro. Transp. Dist.*, 65 Or App 55, 59, 670 P2d 178 (1983), *rev den*, 296 Or 411 (1984) (citing, among other cases, *Jarvill v. City of Eugene*, 289 Or 157, 182-84, 613 P2d 1 (1980)).

To prove a violation of Article I, section 32, a taxpayer must "demonstrate an intentional and systematic pattern of discrimination." *Pacificorp Power Marketing v. Dept. of Rev.*, 340 Or 204, 219, 131 P3d 725 (2006). Proof of an error in judgment on the part of the taxing authority is not sufficient to show intentional discrimination; rather, "[t]he required element has been characterized as 'something that amounts to an intention, or the equivalent of fraudulent purpose, to disregard the fundamental principle of uniformity.'" *Freightliner Corp. v. Dept. of Rev.*, 275 Or 13, 20, 549 P2d 662 (1976) (quoting *Rowley v. Chicago & N.W. Ry.*, 293 US 102, 111, 55 S Ct 55, 79 L Ed 222 (1934)).

The trial court concluded that, although the license fee was not a tax for purposes of the ITFA, it is a tax for purposes of state and federal constitutional protections. The court then concluded that the city's enforcement of the tax violated Article I, section 32, and the Equal Protection Clause because "it attempts to exact a fee only from Comcast and not from similarly-situated providers of Internet access service within its class."

On appeal, the city argues that the trial court looked to the wrong class of providers when evaluating the city's enforcement of the license fee. According to the city, it did not enforce the license fee against dial-up ISPs because those providers do not "own or control, much less locate, facilities in the City's rights-of-way." When compared to the appropriate class—the registered providers who were transmitting data with telecommunications facilities in the city's rights-of-way—Comcast proved shortcomings in the city's collection of the license fee as to only two providers, Qwest Corporation and ELI, which the city contends is insufficient to establish an intentional and systematic pattern of discrimination.

Comcast responds that the city did not collect taxes from at least 34 Internet access service providers who were also subject to the license fee, because even those who do not locate facilities in the city's right-of-way are subject to the license fee as "resellers" of telecommunications services. ECC 3.410(4) provides:

> "So long as it registers with the city as required by section 3.405 *and pays the registration and license fees required by section 3.415*, a reseller may use another person's facilities to engage in telecommunications activities in the right-of-way without obtaining a license, providing the reseller does not, either itself or through an affiliate, own or lease, control or manage any facilities in the right-of-way and is not involved in construction or repair of facilities in the right-of-way. For purposes of calculating the registration and license fees to be paid by a reseller, the amount of compensation paid by the reseller to the owner or manager of facilities in the right-of-way for the services it resells shall be deducted from the reseller's gross revenues before

applying the percentage rates described in section 3.415(1) and (2)."

(Emphasis added.) The ordinance defines a "reseller" as "[a]ny person that provides telecommunications services using a telecommunications facility *for which service a separate charge is made*, where that person does not own, lease, control or manage the telecommunications facility used to provide the service." (Emphasis added.) Comcast reasons that "there is undisputed evidence that dial-up ISPs do pay 'separate charges' for telecommunications facilities" and, therefore, "all of the [Internet access service] providers the City calls 'non-facilities-based' qualify as resellers and owe license fees."

The city replies that Comcast misunderstands the meaning of "reseller," and that the "separate charge" for services refers to a separate charge *made by the reseller*, not a separate charge *imposed on the reseller*. We agree with the city. As a matter of text and context, the phrase "for which service a separate charge is made" refers to a separate charge by the reseller. Textually, "for which service" plainly refers back to the telecommunications services provided by the reseller. Indeed, it is not the original purchase but rather the separate charge to a customer—the second sale—that makes a person a reseller. As a matter of context, ECC 3.410(4) refers to payments made by a reseller as "the amount of compensation paid by the reseller to the owner or manager of facilities" rather than a "charge."

We further agree with the city that Comcast, who has the burden of demonstrating intentional discrimination, *Freightliner Corp.*, 275 Or at 19, failed to prove that dial-up ISPs separately charged their customers for transmission services over the city's right-of-way and therefore owed the license fee as "resellers." As we understand Comcast's argument, that leaves only two providers—ELI and Qwest Corporation—who provided Internet access services through their own facilities within the city's right-of-way and from whom the city did not seek the license fee. The parties did not extensively brief the constitutional issue as it applies to this small class of relevant taxpayers. The city asserts that Comcast failed to establish anything beyond a

short-term clerical error, subsequently corrected. Comcast, for its part, argues that "[t]here is no evidence to support" the city's claim of mere mistake and that, in any event, "Comcast was not required to prove that the city acted in bad faith or with animus toward Comcast." Comcast, then, appears to misperceive both who has the burden to produce evidence, and what that evidence must demonstrate. As noted, to prove a violation of Article I, section 32, or the Equal Protection Clause, Comcast has the burden, and that burden requires it to prove "an intentional and systematic pattern of discrimination," *Pacificorp Power Marketing*, 304 Or at 219, demonstrating "something that amounts to an intention, or the equivalent of fraudulent purpose, to disregard the fundamental principle of uniformity," as opposed to a mere error in judgment, *Freightliner Corp.*, 275 Or at 20 (internal quotation marks and citation omitted). Thus, the fact that there is no evidence to support the city's claim of accident is irrelevant; the city had no obligation to produce such evidence. The relevant question is whether Comcast produced any evidence that the city's taxing decision amounted to an intentional and systematic pattern of discrimination or something akin to fraudulent purpose. Comcast's brief does not cite any evidence to that effect. Thus, we hold that the trial court erred in concluding that the city's efforts to enforce the license fee violate Article I, section 32, and the Equal Protection Clause.[16]

## III. CONCLUSION

In summary, we hold that the trial court erred when, on reconsideration, it interpreted the term "transmission for hire" in the city's ordinance as a term of art in the telecommunications industry; under the plain meaning of the words used in the ordinance, Comcast's cable modem service is the transmission for hire of data, thereby subjecting Comcast to the registration fee and license fee. However, the trial court correctly ruled that the ITFA bars enforcement of the registration fee because that fee is a tax on Internet access

---

[16] In cross-assignments of error, Comcast advances two additional alternative bases for upholding the trial court's ruling regarding the license fees, one based on a federal statute, 47 USC section 542(b), and the other based on a provision of the ordinance, ECC 3.410(6). We reject those arguments without discussion.

that was not generally imposed and actually enforced prior to October 1, 1998. Accordingly, we affirm the trial court's judgment as to the registration fee.

The trial court correctly ruled that the license fee is not a tax under the ITFA, but erred in concluding that the city's enforcement of the license fee was unconstitutional under Article I, section 32, and the Equal Protection Clause. Comcast's proof was not, on this record, enough to demonstrate the "intentional and systematic pattern of discrimination" that is necessary under those constitutional provisions. Accordingly, we reverse and remand the judgment in regard to the city's efforts to collect the license fee.

Reversed in part and remanded.