528 May 26, 2016 No. 31

IN THE SUPREME COURT OF THE
STATE OF OREGON

CITY OF EUGENE,
an Oregon municipal corporation,
*Respondent on Review,*

*v.*

COMCAST OF OREGON II, INC.,
an Oregon corporation,
*Petitioner on Review.*

(CC 160803280; CA A147114; SC S062816)

On review from the Court of Appeals.*

Argued and submitted June 16, 2015.

Peter Karanjia, Davis Wright Tremaine LLP, Washington DC, argued the cause and filed the briefs for petitioner on review. With him on the briefs were Gregory A. Chaimov and Mark P. Trinchero, Portland.

Susan Marmaduke, Harrang Long Gary Rudnick PC, Portland, argued the cause and filed the briefs for respondent on review. With her on the brief were Jerome Lidz, Sivhwa Go, Eugene, and the City of Eugene.

Lisa Rackner, McDowell Rackner & Gibson PC, Portland, filed the brief for *amici curiae* Oregon Cable Telecommunications Association, American Cable Association, National Cable & Telecommunications Association, Oregon Telecommunication Association, Washington Independent Telecommunications Association, Oregon Business Association, and Associated Oregon Industries. With her on the brief were Eric S. Tresh and Robert P. Merten, III, Sutherland Asbill & Brennan LLP, Atlanta, Georgia, Richard A. Finnigan, Olympia, Washington, and Thomas W. Brown, Cosgrave Vergeer Kester, Portland.

_____

* Appeal from Lane County Circuit Court, Karsten H. Rasmussen, Judge. 263 Or App 116, 333 P3d 1051 (2014).

Nancy L. Werner, Beery, Elsner & Hammond LLP, Portland, filed the brief on the merits for *amicus curiae* League of Oregon Cities.

Christy K. Monson, Speer Hoyt LLC, Eugene, filed the brief on the merits for *amici curiae* National Association of Telecommunications Officers and Advisors and Washington Association of Telecommunications Officers and Advisors. With her on the brief was Joseph Van Eaton, Best Best & Krieger LLP, Washington, DC.

Scott A. Shorr and Mark L. Friel, Stoll Stoll Berne Lokting & Shlachter PC, Portland, filed the briefs on the merits and in support of the petition for review for *amicus curiae* Broadband Tax Institute.

Roy Pulvers, Holland & Knight LLP, Portland, filed the brief in support of the petition for review for *amici curiae* Oregon Cable Telecommunications Association, American Cable Association and National Cable & Telecommunications Association.

Richard A. Finnigan, Olympia Washington, filed the brief in support of the petition for review for *amici curiae* Oregon Telecommunications Association, NTCA The Rural Broadband Association and Washington Independent Telecommunications Association.

Before Balmer, Chief Justice, Kistler, Brewer, Baldwin and Nakamoto, Justices.**

BALMER, C. J.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is affirmed in part, reversed in part, and remanded to the circuit court.

_____

** Walters and Landau, JJ., did not participate in the consideration or decision of this case. Linder, J., retired December 31, 2015, and did not participate in the decision of this case.

**BALMER, C. J.**

Through this action, the City of Eugene (the city) attempts to collect from Comcast of Oregon II, Inc. (Comcast) a license fee that the city, acting under a municipal ordinance, imposes on companies providing "telecommunications services" over the city's rights of way. Eugene City Code (ECC) 3.410(1)(b). Comcast does not dispute that it uses the city's rights of way to operate a cable system providing customers with a telecommunications service—namely, broadband Internet access through cable modem service. Comcast, however, objects to the city's collection effort and argues that the license fee is either a tax barred by the Internet Tax Freedom Act (ITFA), 47 USC § 151, note, ITFA §§ 1101-09, or a franchise fee barred by the Cable Communications and Policy Act of 1984 (Cable Act), 47 USC §§ 521-73. The city reads those federal laws more narrowly and disputes Comcast's contrary interpretation. The trial court rejected Comcast's arguments and granted summary judgment in favor of the city. The Court of Appeals affirmed the trial court's grant of summary judgment. *City of Eugene v. Comcast of Oregon II, Inc.*, 263 Or App 116, 142, 148 n 16, 333 P3d 1051 (2014). For the reasons that follow, we affirm those rulings.

## I. BACKGROUND

Before the trial court, the parties filed cross-motions for summary judgment on various grounds. On the issues now before this court, the trial court concluded that there was no genuine issue as to any material fact and that the city, rather than Comcast, was entitled to judgment as a matter of law. *Id.* at 124. The parties focus their arguments in this court on whether either party is entitled to judgment as a matter of law based on relevant local ordinances and federal statutes. As a result, this case primarily presents questions of statutory interpretation. The background facts, although complex, are not materially disputed.

Since 1991, Comcast has operated a cable system within the city under the terms of a franchise that remains in effect today.[1] The rights granted to Comcast under that

---

[1] We use the name "Comcast" to refer to Comcast and its predecessors in interest, TCI Cablevision of Oregon, Inc. and AT&T Broadband. The city codified

franchise are determined by both the franchise agreement itself and federal law governing cable franchising—namely, the Communications Act of 1934, as amended by the Cable Act and the Telecommunications Act of 1996. The franchise authorizes Comcast to construct and operate a cable system over the city's public rights of way in exchange for paying the city a franchise fee. The city charges Comcast the maximum cable franchise fee that federal law allows: five percent of Comcast's gross revenue "derived *** from the operation of the cable system to provide cable services." 47 USC § 542(b). Thus, the city calculates Comcast's cable franchise fee based on revenue Comcast derives from its "cable service," and does not include revenue Comcast derives from noncable services.

The term "cable service" generally refers to the one-way transmission of a package of channels providing video programming as well as any interactive components needed for the subscriber to select from among the programming options provided. *See* 47 USC § 522(6) (defining "cable service").[2] Not every service offered over a "cable system" is a "cable service." A "cable system" is merely a type of communications facility—that is, the physical infrastructure used to transmit certain communications signals. Federal law defines the term "cable system" as "a facility *** designed to provide cable service." 47 USC § 522(7). Nevertheless, a facility designed to provide cable services may be physically capable of providing other, noncable services. *See* HR Rep No 934, 98th Cong, 2d Sess (1984), 44 ("A facility would be a cable system if it were designed to include the provision of cable services *** along with communications services other than cable services.").

the 1991 franchise agreement as Ordinance No. 19775 (1991). In 2007, the parties renewed the terms of the 1991 agreement, extending those terms until 2018. The city codified the 2007 renewal as Ordinance No. 20397 (2007).

[2] Under federal law, "cable service" is defined as "(A) the one-way transmission to subscribers of (i) video programming, or (ii) other programming service, and (B) subscriber interaction, if any, which is required for the selection or use of such video programming or other programming service[.]" 47 USC § 522(6). "Video programming" is defined as "programming provided by, or generally considered comparable to programming provided by, a television broadcast station." 47 USC § 522(20). "Other programming service" is defined as "information that a cable operator makes available to all subscribers generally[.]" 47 USC § 522(14).

Noncable communications services generally fall into one of two categories: a "telecommunications service" or an "information service." *See* 47 USC § 153(53) (defining "telecommunications service"); 47 USC § 153(24) (defining "information service").[3] Distinguishing between "cable services" and noncable services is important in this case because revenue that a cable operator derives from telecommunications or information services is not included in the revenue base used to calculate the cable franchise fee. 47 USC § 542(b).

In 1999, Comcast began offering subscribers in the city a new service in addition to the video programming it had been offering. The new service was a cable modem service providing broadband access to the Internet. Comcast offered its cable modem service over the same cable system that it used to provide cable television video programming— that is, the cable system that Comcast, through its cable franchise rights, was authorized to build and operate over the city's public rights of way. The question arose of how to categorize the cable modem service: whether the function of a cable modem service is a cable, telecommunications, or information service.

Initially, Comcast treated its cable modem service as a cable service and included the revenue generated from that service in the revenue base used to calculate the cable franchise fee. In 2002, however, Comcast stopped doing so after the FCC issued a declaratory order stating that, under the Cable Act, cable modem service was neither a "cable service" nor a "telecommunications service," but was instead an "information service." *In the Matter of Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, 17 FCC Rcd 4798 (2002). Comcast reasoned that because Congress limited the revenue base used to calculate Comcast's cable franchise fee to include only revenue derived from "cable services," 47 USC § 542(b), and because

---

[3] "Telecommunications service" is generally "the offering of telecommunications for a fee directly to the public *** regardless of the facilities used." 47 USC § 153(53). And "information service" is defined as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing[.]" 47 USC § 153(24).

cable modem service is not a "cable service," revenue derived from cable modem service could not be included in the revenue base used to calculate the cable franchise fee.

The FCC order and the status of cable modem service as an information service were the subject of litigation, resulting in a 2005 decision by the United States Supreme Court that affirmed the FCC's order, deferring to the FCC's reasonable interpretation of an ambiguous statute. *National Cable & Telecommunications v. Brand X*, 545 US 967, 125 S Ct 2688, 162 L Ed 2d 820 (2005). By upholding the FCC's order, the Supreme Court confirmed that the city could not include revenue derived from cable modem services in the revenue base used to calculate Comcast's cable franchise fee. Although, beginning in 2002, Comcast stopped paying a cable franchise fee based at all on revenue from cable modem services, Comcast continued to provide cable modem services through its cable system and over the city's public rights of way.

In 2007, the parties renewed the terms of their cable franchise agreement. Shortly after renewing the franchise agreement, the city attempted to recapture fees based on the revenue Comcast derived from its cable modem service by imposing a municipal license-fee requirement on the delivery of "telecommunications services" over the city's public rights of way. ECC 3.410. The city based that license-fee requirement on Ordinance No. 20083 (1997) (the ordinance), which the city had enacted in 1997 but had not previously enforced on cable modem services. *See* ECC 3.400-3.430 (codifying Ordinance No. 20083).

The ordinance requires that companies obtain a license before providing "telecommunications services" over the city's public rights of way. ECC 3.410. To obtain that license, a company must pay the city a license fee equal to seven percent of the revenue that the company generates within the city from its "telecommunications activities," ECC 3.415(2), which includes "telecommunications service," ECC 3.005.

The ordinance defines "telecommunications services" as "[t]he transmission for hire, of information in electromagnetic frequency, electronic or optical form, including,

but not limited to, voice, video, or data." ECC 3.005. That broad definition "includes all forms of telephone services and voice, data and video transport, but does not include * * * cable service[.]" *Id.* The ordinance uses the same definition of "cable service" that federal law uses, but it uses a slightly different definition for "telecommunications services" and does not include the term "information services."

Like federal law, the ordinance does not treat all communications services provided through a "cable system" as a "cable service."[4] Instead, the ordinance anticipates that telecommunications services may be provided over a cable system and requires a license for telecommunications services even when the telecommunications provider already has a franchise to provide cable services over the cable system. *See* ECC 3.410(3) (stating that a cable operator must obtain a license "should it intend to provide telecommunications services over the same [cable system]"). Thus, telecommunications services are treated as telecommunications services regardless of the facility used to provide them. And, to the extent that a cable operator provides both cable services and telecommunications services, that cable operator is treated as a cable operator with respect to its cable services and is treated as a telecommunications provider with respect to its telecommunications services.

The city maintained that Comcast's cable modem service was a "telecommunications service" under the ordinance and was, therefore, subject to the ordinance's license-fee requirement. As a result, the city sought from Comcast seven percent of the revenue Comcast derived from its cable modem services within the city from 1999 through 2008.[5] When the city did not receive the payment it sought, the city brought this action against Comcast. Before the trial court, the parties filed cross-motions for summary judgment on a

---

[4] The ordinance's definition of "cable system" tracks almost verbatim the federal definition of "cable system." *Compare* ECC 3.005 (defining "cable system") *with* 47 USC § 522(7) (defining "cable system").

[5] As noted above, Comcast paid the city five percent of its revenue from cable modem service as part of its franchise fee payments from 1999 until 2002, when the FCC held that cable modem service was not a "cable service." The city, however, maintains that Comcast should have been paying seven percent of its revenue from cable modem service as part of its license fee payments, and the city now seeks the difference between those payments for those years.

number of issues, including the two issues now before this court: whether the license fee is a tax barred by ITFA or a franchise fee barred by the Cable Act.[6]

ITFA bars state and local governments from imposing "taxes on Internet access." ITFA § 1101(a)(1). The parties disputed whether the license fee is, in fact, a "tax." ITFA defines "tax" as "any charge imposed by any governmental entity for the purpose of generating revenues for governmental purposes, and is not a fee imposed for a specific privilege, service, or benefit conferred." ITFA § 1105(8)(A)(i).

Comcast argued that the city imposes the license fee to generate revenue for governmental purposes, thus qualifying the fee as a tax. The city argued, however, that the fee was imposed for a specific privilege—namely, the right to provide cable modem services over the city's rights of way. Comcast countered that the license could not confer that privilege on Comcast because Comcast had a preexisting right under its cable franchise to provide cable modem services over the city's rights of way.

The trial court agreed with the city and held that the license fee was not a tax on Internet access barred by ITFA: "Comcast is paying the license fee for the privilege of using the City's right-of-way. Thus the license fee is a fee imposed for a specific privilege, service, or benefit conferred and not a tax under ITFA." The trial court did not address Comcast's argument that it had a preexisting right to use the city's rights of way to provide cable modem services.

As to the Cable Act, Comcast argued that, although the Cable Act authorizes local governments to charge fees to a cable operator for the right to use public rights of way, the Cable Act nevertheless caps those fees at five percent of the revenue derived from "cable services," which excludes cable modem services. 47 USC § 542(b). According to Comcast, it provides cable modem services as a "cable operator." Comcast therefore argued that the city's fee was already at the fee cap because the city was charging Comcast the five percent

---

[6] The parties filed cross-motions for summary judgment on numerous other issues as well, which are not part of this review. The complete procedural history of the case is set out in the Court of Appeals decision. *Comcast of Oregon II, Inc.*, 263 Or App at 123-26.

cable franchise fee based on its cable services. Thus, the city exceeded the cap by charging the seven percent license fee on its cable modem revenue.

In response, the city argued that the license fee did not fit within the Cable Act's definition of "franchise fee," which "includes any tax, fee, or assessment of any kind imposed by a franchising authority or other governmental entity on a cable operator or cable subscriber, or both, *solely* because of their status as such," 47 USC § 542(g)(1)(A) (emphasis added), and which excludes "any tax, fee, or assessment of general applicability (including any such tax, fee, or assessment imposed on both utilities and cable operators or their services but not including a tax, fee, or assessment which is unduly discriminatory against cable operators or cable subscribers)," 47 USC § 542(g)(2). According to the city, the license fee is not a "franchise fee" because the city does not impose the license fee solely on cable operators. The city argued that, instead, the license fee was a fee of "general applicability" imposed on all telecommunications providers using public rights of way.

The trial court again agreed with the city and held that the license fee was not a franchise fee barred by the Cable Act: "The Ordinance applies to all utilities that use the City's right of way, thus Comcast is not being charged a license fee *solely* because of its status as a cable operator, and thus the license fee is not preempted." (Emphasis in original.)

The Court of Appeals agreed with those trial court rulings on appeal. Without further discussion, the Court of Appeals held, "ITFA does not bar the city's license fee, which is a fee imposed in exchange for using the city's right-of-way to provide a telecommunications service." *Comcast of Oregon II, Inc.*, 263 Or App at 142. Further, in a footnote at the end of its opinion, the Court of Appeals also rejected without discussion Comcast's argument that the license fee is an improper franchise fee under the Cable Act. *Id.* at 148 n 16.[7] Comcast petitioned this court to review the Court of

---

[7] The brevity of the Court of Appeals' analysis of the issues before us reflects the fact that, although preserving those issues, the parties focused their arguments on appeal on a different issue: whether Comcast's cable modem services

Appeals decision only as to whether the license fee is a tax barred by ITFA or a franchise fee barred by the Cable Act. We allowed Comcast's petition.

While this case was pending on review, the FCC reconsidered its prior order that had concluded that cable modem service is an "information service" under federal law. In *In the Matter of Protecting & Promoting the Open Internet*, 30 FCC Rcd 5601 (2015), the FCC concluded instead that cable modem service falls within the federal definition of "telecommunications service." Because that reclassification does not change the FCC's prior conclusion that cable modem service is not a "cable service," federal law continues to exclude revenue derived from cable modem service from the revenue base used to calculate the cable franchise fee. But the FCC's order subjects the provision of cable modem services to certain telecommunications regulations that were not previously applicable. We address those matters below.

## II.   ANALYSIS

On review, Comcast reprises its argument that the city's license fee is a tax barred by ITFA or a franchise fee barred by the Cable Act. Comcast has not asked us to review the Court of Appeals' conclusion that the ordinance applies to Comcast's cable modem services nor has it raised questions about the city's authority under state law to collect the license fee at issue. Instead, Comcast argues that, even if state and local law allow the city to collect a license fee on Comcast's cable modem service, either ITFA or the Cable Act provide Comcast with a valid defense to the city's collection effort. We address those arguments in turn.

## A.   *ITFA*

Congress enacted ITFA in 1998 as a temporary moratorium on state and local taxation of Internet access.

---

fell within the ordinance's definition of "telecommunications service." The trial court had held that Comcast's cable modem services fell outside that definition and therefore outside the license-fee requirement. The Court of Appeals reversed the trial court's ruling on that issue, agreeing with the city that Comcast's cable modem services fell within the ordinance's definition of "telecommunications services." *Id.* at 141. Comcast did not seek review of that issue, so the interpretation and application of the ordinance itself is not before this court. Instead, we address only whether the ordinance, as interpreted by the Court of Appeals and applied to Comcast, conflicts with federal law.

Congress has extended that moratorium numerous times, including the entire time period at issue in this case. In February 2016, that moratorium became permanent. Pub L 114-125 § 922 (2016).

As noted above, ITFA prohibits state and local governments from imposing "taxes on Internet access," ITFA § 1101(a)(1), and defines "tax" as "any charge imposed by any governmental entity for the purpose of generating revenues for governmental purposes, and is not a fee imposed for a specific privilege, service, or benefit conferred." ITFA § 1105(8)(i). Comcast contends that the trial court and Court of Appeals erred in concluding that payment of the license fee conferred on Comcast a specific privilege—namely, the right to provide cable modem service over the city's public rights of way—and is therefore not a tax.

According to Comcast, a fee may not qualify as "a fee imposed for a specific privilege * * * conferred" if the fee confers only a right already possessed by the party paying the fee. And Comcast maintains that it already possessed the right to provide cable modem service over the city's public rights of way. Comcast finds that preexisting right in both the franchise agreement itself and the federal Communications Act.

Whether a fee conferring only preexisting rights qualifies as "a fee imposed for a specific privilege * * * conferred" under ITFA is a question of statutory construction. But it is a question we need not reach in this case because we reject the premise of Comcast's argument—namely, that either the franchise agreement or the Communications Act provides it with a preexisting right to provide cable modem services over the city's public rights of way.

1. *Franchise agreement*

Comcast first argues that the cable franchise agreement gives it the right to provide cable modem services over the city's public rights of way. Comcast's cable franchise agreement, although codified in a city ordinance, is comprised of terms negotiated by Comcast and the city as a contract and authorizes Comcast to engage in certain activities

using those rights of way. "A franchise allows the grantee to exercise powers which, without the franchise, the grantee could not exercise." *Northwest Natural Gas Co. v. City of Portland*, 300 Or 291, 308, 711 P2d 119 (1985).

In support of its claim that the cable franchise agreement grants it the right to provide cable modem services over the city's public rights of way, Comcast principally relies on a provision in the franchise agreement stating, "A non-exclusive franchise is hereby granted to [Comcast] *** to install, construct, operate, maintain, reconstruct, and expand a cable communications system within the public streets, ways, alleys, public utility easements, and places of the City of Eugene ***." Ordinance No. 19775, § 1.[8]

Comcast notes that the right conferred by the cable franchise includes the right to "operate" a cable communications system. And Comcast argues that the right to operate a cable communications system includes the right to provide any services that the cable communications system is physically capable of providing, such as cable modem services. According to Comcast, that right applies even to services, like cable modem services, that it was not providing at the time the franchise agreement was codified in 1991.

The proper construction of a municipal ordinance is a question of law, which we resolve using the same rules of construction that we use to interpret statutes. *See Lincoln Loan Co. v. City of Portland*, 317 Or 192, 199, 855 P2d 151 (1993) ("The same rules that govern the construction of statutes apply to the construction of municipal ordinances."). Therefore, "[w]e look primarily to the [ordinance]'s text, context, and legislative history, although we may look also

---

[8] In general, a "cable communications system" under the franchise agreement is analogous to a "cable system" under the Cable Act—that is, a specific type of communications facility that has a physical infrastructure designed to provide cable communications services. The franchise agreement defines "cable communications system" as

"a system of antennas, cable, amplifiers, towers, microwave links, waveguides, laser beams, earth stations, or any other conductors, converters, equipment, or facilities, designed and constructed for the purpose of producing, receiving, amplifying, storing, processing or distributing audio, video, digital, or other forms of electronic or electrical signals."

Ordinance No. 19775, § 3.

to general rules of statutory construction as helpful." *Alfieri v. Solomon*, 358 Or 383, 392, 365 P3d 99 (2015).

We reject Comcast's interpretation. As an initial matter, Comcast reads "operate" too broadly, conflicting with how we normally understand that word. *Webster's Third New International Dictionary* (unabridged ed 2002) most relevantly defines "operate" to mean "to cause to function usually by direct personal effort **:** WORK <[*operate*] a car> <*operating* a drill press>." *Id.* at 1581.[9] Thus, a person operates a car by causing the car to function. That will usually mean causing the car to drive. A person operates a car whenever that person drives the car, even if the state limits the speed at which the driver may travel or limits the types of cargo or number of passengers that the car may contain. We would not normally think that the right to "operate" a car confers a right to operate it in any manner whatsoever.

In the same way, a company operates a cable communications system by causing the system to function—that is, to send or receive electronic or electrical signals over a cable communications system. But we would not normally think that the right to "operate" a cable communications system confers a right to operate it in any manner whatsoever or to provide any services the operator chooses.

With respect to the services that Comcast is authorized to provide, the franchise agreement itself limits the scope of that right under the franchise. Immediately after the sentence granting Comcast the right to operate a cable communications system over the city's public rights of way, the franchise agreement states, "This franchise shall constitute both a right and an obligation to provide the service of a cable communications system *as required by the provisions of this ordinance*." Ordinance No. 19775, § 3.

The city reads that provision as granting Comcast only the right to provide those services that Comcast is required to provide under the agreement. The services required by the franchise agreement largely appear in

---

[9] The other definitions of "operate" as a transitive verb include, "to cause to occur **:** bring about by or as if by the exertion of positive effort or influence **:** INITIATE" and "to perform surgery on." *Id.*

Section 5 and largely relate to cable television service, as opposed to other types of communications services.[10] The franchise agreement does not mention cable modem services, and Comcast makes no argument that cable modem service is among those services that the franchise agreement requires Comcast to provide.

Nevertheless, Comcast contends that the provision need not be read so narrowly. Comcast compares the grant of authority conferred through the franchise agreement to the authority at issue in *Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 337 P3d 768 (2014), in which this court interpreted the phrase "data transmission services" in a 1973 statute to include internet access services even though internet access services were not widely available at the time the statute was enacted. In this case, the trial court gave the franchise a similarly broad reading: "[E]ven if cable modem service was not explicitly contemplated when the franchise was enacted, the franchise was intended to authorize a broad range of activities, including cable modem service."

The city's reading is more faithful to the plain language of the provision. Comcast's opposing argument establishes, at most, that the provision may contain ambiguity. But establishing ambiguity does not help Comcast's argument. In this case, Comcast is the franchise grantee. "In interpreting \*\*\* franchises, 'if the terms of the franchise are doubtful, they are to be construed strictly *against the grantee* and liberally in favor of the public.'" *Northwest Natural Gas*, 300 Or at 308 (quoting *City of Joseph v. Joseph Water Works Co.,* 57 Or 586, 591, 111 P 864, 112 P 1083 (1911) (emphasis added)). Therefore, no rights are conferred on a grantee by implication, and that which has not been expressly granted has been withheld. *See generally Copeland v. City of Waldport*, 147 Or 60, 68-70, 31 P2d 670 (1934) (discussing and relying on federal case law applying

---

[10] The required services address, for example, the system's channel capacity, the inclusion of local broadcast channels in "basic service," the provision of "premium programming service," the availability of the system to public institutions, the use of the system during an emergency or disaster, and the provision of channels "dedicated for public, educational, and local government access programming." Ordinance No. 19775, § 5.

the principle that "public grants are to be construed strictly and that nothing passes by implication").[11]

Thus, under the franchise agreement itself, without considering any additional rights or obligations based on the federal Communications Act, Comcast's service rights extend only as far as Comcast's service obligations. Because the franchise does not *require* Comcast to provide cable modem service, the franchise does not confer on Comcast the right to provide cable modem service.

2. *Communications Act*

Comcast also contends that, even if the franchise agreement does not expressly include the right to provide cable modem services, the Communications Act requires reading the franchise agreement to include the right to provide cable modem services. To the extent that the Communications Act requires reading the franchise agreement as conferring rights that the franchise agreement reserves, the Communications Act controls. *See* 47 USC § 556(c) ("Except as provided in section 557 of this title, any provision of law of any State, political subdivision, or agency thereof, or franchising authority, or any provision of any franchise granted by such authority, which is inconsistent with this chapter shall be deemed to be preempted and superseded."). Comcast therefore relies on the Communications Act as a source of its claimed preexisting right to provide cable modem services over the city's public rights of way.

As enacted in 1934, the Communications Act created the FCC to regulate the common carriage of broadcast and telephone communications. *See Nat'l Cable Television Ass'n. v. FCC*, 33 F3d 66, 68 (DC Cir 1994) (describing history of the Communications Act). Although the Communications Act did not expressly direct or authorize the FCC to regulate cable services, the FCC began regulating cable services in 1960. The United States Supreme Court upheld the FCC's regulation of cable services as "reasonably ancillary to the

---

[11] The fact that this case involves the interpretation of a franchise agreement, coupled with the lack of legislative history suggesting a broader reading, distinguish this case from *Comcast Corp.* and, therefore, undermines Comcast's reliance on that case.

effective performance of the Commission's various responsibilities for the regulation of television broadcasting." *United States v. Southwest Cable Co.*, 392 US 157, 178, 88 S Ct 1994, 20 L Ed 2d 1001 (1968).

The FCC continued to regulate cable companies without congressional direction until 1984, when Congress enacted the Cable Act, which added a new subchapter to the Communications Act specifically addressing the regulation of cable services. The Cable Act codified many of the regulations that the FCC had developed. *Nat'l Cable Television Ass'n*, 33 F3d at 69. Those included a ban on telephone-cable cross-ownership "prohibit[ing] telephone companies from directly providing cable television service to subscribers." *Id.* at 68. They also included preserving a system of dual jurisdiction over cable services "whereby the state or local government issued franchises while the FCC exercised 'exclusive authority over all operational aspects of cable communication, including technical standards and signal carriage.'" *Id.* at 69 (quotation omitted). Congress later amended provisions created by the Cable Act when it enacted the Telecommunications Act of 1996, which removed the ban on telephone-cable cross-ownership and facilitated greater competition in the market for telecommunication services.

In an effort to establish a right under federal law to provide cable modem services over the city's public rights of way, Comcast relies on numerous provisions of the Communications Act, as amended by the Cable Act and the Telecommunications Act. We address each in turn.

a. Cable Act

Comcast first relies on a provision enacted as part of the Cable Act ensuring that cable franchises grant franchisees access to public rights of way. That provision, 47 USC § 541(a)(2), states that "[a]ny franchise shall be construed *to authorize the construction of a cable system over public rights-of-way*, and through easements, which is within the area to be served by the cable system and which have been dedicated for compatible uses[.]" *Id.* (emphasis added).

Like the similar provision in the franchise agreement that Comcast relied on, Comcast reads this provision to authorize not only the right to construct a cable system, but also the right to use the cable system to provide services in addition to cable services that the cable system is physically capable of providing, including cable modem services. In opposition to that reading, the city points out that the provision authorizes only the "construction" of a cable system, *id.*, but says nothing about the manner in which the cable system may be used or what services a cable operator may provide over that system once it is constructed. Comcast, however, argues that the right to "construct" a cable system would be illusory if it did not entail the right to use the cable system.

We reject Comcast's reading, which misidentifies the nature of the dispute. The city concedes that Comcast has a right to use the cable system. The city argues only that Comcast's right to use the cable system does not include the right to use the cable system to provide cable modem services. As a result, the question is not whether Comcast has a right to use the cable system; the question is the scope of that right.

Determining the scope of the rights required by that federal statute is a matter of federal law. "When this court construes a federal statute * * *, we follow the methodology prescribed by the federal courts. Federal courts generally determine the meaning of a statute by examining its text and structure and, if necessary, its legislative history." *Corp. of Presiding Bishop v. City of West Linn*, 338 Or 453, 463, 111 P3d 1123 (2005) (internal citation omitted).

The text of the statute appears to support the city's narrower interpretation. The statute requires reading the franchise agreement as granting Comcast a right to "construct" a cable system. The franchise agreement, like most cable franchise agreements, unambiguously grants that right already. Ordinance No. 19775, § 1. Commentators therefore have noted that, in most cases, such as this one, 47 USC § 541(a)(2) operates as a redundancy rather than as a source of additional rights:

> "It is difficult to understand what [47 USC § 541(a)(2)] adds, in terms of a rule of construction, to what already is the heart of a franchise grant. The 1984 Cable Act does not provide for the use of rights-of-way in any manner inconsistent with rights reserved by those who have the power to reserve rights in the public rights-of-way."

Daniel L. Brenner, *et al.*, 1 *Cable Television and Other Nonbroadcast Video* § 3:24 (2015). As a result, a plain reading of the statute suggests that the scope of Comcast's right to use the cable system is determined by the franchise agreement or other provisions of law.

Comcast attempts to buttress its statutory analysis of 47 USC § 541(a)(2) with legislative history, relying on the committee report that accompanied the Cable Act. Comcast quotes the report as stating that "'cable operators are permitted under the provisions of the [Cable Act] to provide any mixture of cable and non-cable service they choose,' and '[a] facility would be a cable system if it were designed to include the provision of cable services (including video programming) along with communications services other than cable service.'" Quoting HR Rep No 934, 98th Cong, 2d Sess at 44.

Comcast, however, takes those quotes out of context. The section of the report Comcast quotes from does not purport to address the scope of the authorization described in 47 USC § 541(a)(2). Instead, that section addresses the definitions of "cable service" and "cable system." HR Rep No 934, 98th Cong, 2d Sess at 44. When read in context, the quoted sections of the report that Comcast relies on establish only that a cable system remains a cable system, for the purposes of the Cable Act, even if it is used to provide noncable services:

> "While cable operators are permitted under the provisions of [the Cable Act] to provide any mixture of cable and non-cable service they cho[o]se, the manner in which a cable service is marketed would not alter its status as a cable service. For instance, the combined offering of a non-cable shop-at-home service with service that by itself met all the conditions for being a cable service would not transform the shop-at-home service into a cable service, or transform the cable service into a non-cable communications service.

"\* \* \* The term 'cable system' is not limited to a facility that provides only cable service which includes video programming. Quite the contrary, many cable systems provide a wide variety of cable services and other communications services as well. A facility would be a cable system if it were designed to include the provision of cable services (including video programming) along with communications services other than cable services."

*Id.*

The legislative history establishes, at most, that the Cable Act does not prohibit a cable operator from providing noncable services. In that sense, and only in that sense, the 1984 Cable Act "permit[s]" cable operators to provide noncable services. But the legislative history does not establish, as Comcast contends, that the Cable Act grants cable operators an affirmative right to provide noncable services, prohibiting state or local authorities from regulating noncable services or charging fees for the right to provide noncable services over the cable system that occupies public rights of way.[12]

Other legislative history supports that reading. The same committee report that Comcast quotes includes a section actually addressing the statute that Comcast relies on, 47 USC § 541(a)(2). There, the report indicates that congressional drafters were aware that cable systems could be used to provide noncable communications services and that the Cable Act was not intended to limit or affect the legal treatment of those services:

"Several proceedings are underway now to determine the regulatory treatment of non-cable communications services provided over cable systems, such as data transmission and private-line voice services. \* \* \*

"The Committee does not intend to resolve or even address the issue of the state or Federal treatment of non-cable

_____

[12] Comcast attempts to make the same point—that the Cable Act confers a right protecting cable companies from the regulation of noncable services offered over a franchised cable system—by relying on the FCC's decision in *In the Matter of Heritage Cablevision Associates of Dallas, L.P., & Texas Cable TV Ass'n v. Texas Utilities Elec. Co.*, 6 FCC Rcd 7099 (1991). But that decision, like the legislative history, establishes only that a cable system does not cease to be a cable system merely because the cable operator provides noncable services. *Id.* at 7104 ("[I]ts facilities are a 'cable system' within the meaning of the Cable Act, even though TCI also provides data transmission services over its system.").

communications services offered over cable systems raised in these proceedings. *The Committee intends that state and Federal authority over non-cable communications services under the status quo shall be unaffected by the provisions of [the Cable Act].*

"*** While the Committee recognizes that non-cable communications services are subject to regulatory authority, the Committee does not intend to suggest that these services should be regulated or that they should be deregulated. *The Committee intends to leave the decision concerning the exercise of regulatory authority over non-cable communications services to the appropriate regulatory bodies.*"

HR Rep No 934, 98th Cong, 2d Sess at 60 (internal citations omitted; emphases added). Thus, the legislative history confirms our initial reading: 47 USC § 541(a)(2) ensures that Comcast has the right to construct a cable system, but the scope of Comcast's right to use the cable system—including the right to provide cable modem services—is determined by other applicable laws.[13]

### b.   Telecommunications Act

Even if provisions of the Cable Act do not provide grounds for preemption, Comcast additionally argues that provisions added in 1996 by the Telecommunications Act provide it with rights to use the cable system that are inconsistent with, and therefore preempt, the city's license-fee requirement. *See* 47 USC § 556(c) (preempting state or local laws inconsistent with the Communications Act).

As noted above, the Telecommunications Act removed the prior ban on telephone-cable cross-ownership. Thus, anticipating greater overlap between telecommunications providers and cable operators, Congress added provisions to

---

[13] Comcast also relies on 47 USC § 544(a), which provides, "Any franchising authority may not regulate the services, facilities, and equipment provided by a cable operator except to the extent consistent with this subchapter [governing cable services]." Even if the city's license fee "regulate[s] the services, facilities, and equipment provided by a cable operator," that statute likewise requires Comcast to demonstrate an inconsistency between the city's license-fee requirement and some other provision of the Communications Act governing cable services. *See Storer Cable Communications v. City of Montgomery*, 806 F Supp 1518, 1544-45 (MD Ala 1992) ("A local regulation which is governed by subsection (a) *** will be struck down if a challenger can show an inconsistency between the local rule and federal regulation.").

the Communications Act to account for that change. Those provisions provide:

> "(A)   If a cable operator or affiliate thereof is engaged in the provision of telecommunications services—
>
> "(i)   such cable operator or affiliate shall not be required to obtain a franchise under this subchapter for the provision of telecommunications services; and
>
> "(ii)   the provisions of this subchapter shall not apply to such cable operator or affiliate for the provision of telecommunications services.
>
> "(B)   A franchising authority may not impose any requirement under this subchapter that has the purpose or effect of prohibiting, limiting, restricting, or conditioning the provision of a telecommunications service by a cable operator or an affiliate thereof.
>
> "(C)   A franchising authority may not order a cable operator or affiliate thereof—
>
> "(i)   to discontinue the provision of a telecommunications service, or
>
> "(ii)   to discontinue the operation of a cable system, to the extent such cable system is used for the provision of a telecommunications service, by reason of the failure of such cable operator or affiliate thereof to obtain a franchise or franchise renewal under this subchapter with respect to the provision of such telecommunications service."

47 USC § 541(b)(3). Comcast argues, based on those provisions, that the Communications Act precludes the city from imposing fees on Comcast, as a cable operator, for its telecommunications services, including its cable modem services.

There are, however, two ways to read those provisions. On the one hand, as Comcast contends, the provisions can be read to protect cable companies from burdens imposed by state or local governments on offering telecommunications services over cable systems. Under that protection, the cable companies could better compete with telecommunications companies in the market for telecommunications services. A major purpose of the Telecommunications Act, after

all, was to introduce greater competition into the market for telecommunications services.

On the other hand, as the city contends, the provisions can be read as limitations only on the *cable* franchising process and the terms that may be included in a *cable* franchise agreement. Under that reading, the provisions would not prevent the city from imposing fees on telecommunications services when it is acting outside the cable franchising process and is otherwise entitled to do so.

We agree with the city's reading of the provisions. Although Congress intended the Telecommunications Act to introduce competition into the market for telecommunications services, it did not do so by exempting cable companies from fees generally applicable to telecommunications services.

The textual support for that reading starts with the statutory framework within which Congress passed the Telecommunications Act. Specifically, the Cable Act, in a provision that has not been changed in any relevant respect since its 1984 enactment, defines "cable system" to exclude "a facility of a common carrier which is subject, in whole or in part, to the provisions of title II of this chapter [relating to common carrier regulation, 47 USC §§ 201-276], except that such facility shall be considered a cable system * * * *to the extent* such facility is used in the transmission of video programming directly to subscribers[.]" 47 USC § 522(7)(C) (emphasis added). The Telecommunications Act then added that a telecommunications carrier is a common carrier providing telecommunications services, but "only *to the extent* that it is engaged in providing telecommunications services[.]" 47 USC § 153(51) (emphasis added). "Taken together, a cable operator, when it is providing telecommunications service, is not a cable system; and when it is providing cable service, it is not subject to Title II as a common carrier." 2 *Cable Television and Other Nonbroadcast Video* § 11:12; *see also* Peter W. Huber, *et al.*, *The Telecommunications Act of 1996* § 3.3.2 (1996) ("[C]ommon carriers providing ordinary, wireline 'cable services' * * * are regulated in the same manner as other cable operators, so far as their cable-like operations are concerned.").

We find similar context in the manner in which Congress distinguished between the regulatory classifications of communications services when it enacted the Telecommunications Act. The FCC has recognized that, as it relates to distinguishing cable, telecommunications, and information services, none of those classifications "rests on the particular types of facilities used. Rather, each rests on the function that is made available." *In re Inquiry Concerning High-Speed Access to the Internet*, 17 FCC Rcd 4798 at 4821; *see also* 47 USC § 522(6) (defining "cable services"); 47 USC § 153(53) (defining "telecommunications service"); 47 USC § 153(24) (defining "information service"). That is expressly the case for "telecommunications service," which the Act defines as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, *regardless of the facilities used*." 47 USC § 153(53) (emphasis added).

Thus, considering the Telecommunications Act in context, we conclude that it created a regulatory scheme that focuses on the function of the service provided rather than on the communications facility used to provide it. Within that scheme, telecommunications services are generally treated as telecommunications services and cable services as cable services, regardless of who provides the service or how.

Understanding that context reveals the narrow scope of the limitations imposed by 47 USC § 541—limitations that Comcast contends prevent the city from seeking compensation for Comcast's use of the public rights of way. Congress directed those limitations to rights arising under "this subchapter"—that is, under the section of the Communications Act governing cable services. Most notably, "If a cable operator *** is engaged in the provision of telecommunications services, *** the provisions of *this subchapter* shall not apply to such cable operator or affiliate for the provision of telecommunications services." 47 USC § 541(b)(3)(A)(ii) (emphasis added). That provision is best read as establishing that telecommunications services are not to be regulated as cable services, and not subject to cable franchising requirements, merely because those telecommunications services are provided over a cable system.

Additionally, subparagraph (B) precludes a franchising authority from imposing "any requirement *under this subchapter*" that "prohibit[s], limit[s], restrict[s], or condition[s] the provision of a telecommunications service by a cable operator." 47 USC § 541(b)(3)(B) (emphasis added). Comcast plausibly argues that the city's license-fee requirement, in practice and effect, limits, restricts, or conditions Comcast's ability to provide telecommunications services. But Comcast makes no argument establishing that the license-fee requirement is one imposed by the city under the subchapter of the Communications Act regulating cable services or cable franchising.

The meaning of "under this subchapter" is informed by the fact that Congress framed the limitations contained in those provisions as limitations on "franchising authorities," rather than on state or local governments generally. Under the Communications Act, a "franchising authority" is the governmental entity empowered to grant cable franchises. *See* 47 USC § 522(10) (defining "franchise authority"); *see also* 47 USC § 522(9) (defining "franchise"). It appears that Congress intended to limit cable franchising authorities functioning as cable franchising authorities—that is, in the cable franchising process or in the enforcement of cable franchising terms—but not to limit the rights that those governmental entities otherwise have outside the cable franchising process. If Congress intended to protect cable operators from burdens generally imposed, rather than burdens imposed in the cable franchising process or in the enforcement of cable franchising terms, then Congress would have imposed those limits on state or local governments generally, rather than specifically on cable franchising authorities.

Comcast responds that such a narrow reading of the limitation in subparagraph (B) would defeat its purpose because franchising authorities could simply impose new fees outside the franchising process. But Comcast misses the point of the limitation. If the city attempted to impose the license fee as part of its franchising authority, it could use its position as gatekeeper to the cable-services market to leverage Comcast's agreement to fees that the city might not otherwise be empowered to impose. The text and context of the provision suggest that Congress intended only

to avoid entangling telecommunications services and cable services in that manner.

The legislative history confirms our reading that the provisions Comcast relies on were not intended to exempt telecommunications services offered by cable operators from fees that state or local governments are otherwise allowed to impose on telecommunications services. The conference report accompanying the Telecommunications Act addresses the provisions now appearing at 47 USC § 541(b)(3)(A)-(C). The report does not directly offer an interpretation of those provisions, but it states,

> "The conferees intend that, to the extent permissible under State and local law, telecommunications services, including those provided by a cable company, shall be subject to the authority of a local government to, in a nondiscriminatory and competitively neutral way, manage its public rights-of-way and charge fair and reasonable fees."

HR Rep No 458, 104th Cong, 2d Sess (1996), 180. The standard described in the report—that local governments may manage their public rights of way by imposing "fair and reasonable" fees on telecommunications services in "a nondiscriminatory and competitively neutral way"—is the standard applied to local government management of its rights of way taken from the section of the Communications Act governing telecommunications services. Specifically, 47 USC § 253(c) provides:

> "Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government."[14]

---

[14] That provision is an exception to a broader provision banning state-imposed barriers to entry of the telecommunications market: "No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 USC § 253(a); *see also AT&T Communications v. City of Eugene*, 177 Or App 379, 403-05, 35 P3d 1029 (2001) (discussing relationship between the ban on barriers to entry and the carve-out for managing rights of way). In its supplemental brief to this court, Comcast

Thus, the best reading of the conference report is that, despite the limitations imposed on franchising authorities in 47 USC § 541(b)(3)(A)-(C), the conferees expected that not only would local governments be able to impose fees on telecommunications services provided over franchised cable systems using public rights of way but also that those telecommunications services would continue to be subject to the limitations that generally apply to telecommunications services.

Comcast's final argument relies on a footnote in the recent FCC order re-categorizing cable modem service from being an information service to being a telecommunications service. In that order, the FCC states,

> "We note also that we do not believe that the classification decision made herein would serve as justification for a state or local franchising authority to require a party with a franchise to operate a 'cable system' (as defined in Section 602 of the Act) to obtain an additional or modified franchise in connection with the provision of broadband Internet access service, or to pay any new franchising fees in connection with the provision of such services."

*In the Matter of Protecting & Promoting the Open Internet*, 30 FCC Rcd at 5804 n 1285.

Comcast argues that the FCC's footnote is inconsistent with the city's license-fee requirement and is binding on this court because FCC orders cannot be collaterally attacked in this court. 47 USC § 402(b) (granting the United States Court of Appeals for the District of Columbia exclusive jurisdiction to hear appeals from FCC orders); 47 USC § 402(a) (granting federal courts of appeals exclusive jurisdiction to hear proceedings "to enjoin, set aside, annul, or suspend any order" by the FCC).

---

noted that it "is not asserting—and has never asserted—a claim that the City's action in this case violates Section 253(a)." We therefore have not been asked, and do not reach, the issue of how the city's license-fee requirement would fare under the standards of 47 USC § 253(a) and (c). In any event, at the time the parties presented this case to the trial court, cable modem service was not treated as a telecommunications service and thus fell beyond the reach of those provisions. The parties, therefore, did not present arguments to the trial court on those issues.

Comcast's argument, however, fails at the outset because it is premised on a misreading of the order itself. Like the provisions added by the Telecommunications Act, the FCC's footnote is directed at "franchising authorit[ies]" and the payment of "franchising fees." Within the statutory scheme at issue, those terms refer specifically to *cable* franchising authorities and *cable* franchising fees. Thus, we read the FCC's footnote as stating that its decision should have no effect on the cable franchise rights of cable companies, which merely reaffirms the proposition that telecommunications services should not be regulated through the cable franchising process.

In conclusion, Comcast's argument that the city's license fee is a tax prohibited by ITFA therefore fails. Comcast's argument depended on establishing that it had a preexisting right to provide cable modem services over the city's public rights of way. It has failed to establish that either the franchise agreement or the Communications Act provides it with such a right. We therefore hold that ITFA provides Comcast with no defense to the city's license-fee requirement.

B.  *Cable Act*

Comcast alternatively attempts to establish another defense to the city's license-fee requirement—this one based directly on the Cable Act rather than ITFA. As described above, the Cable Act authorizes local governments to impose a "franchise fee" on a cable operator for the right to use public rights of way and caps those fees at five percent of the revenue derived from "cable services." 47 USC § 542(b). And, as also described above, Comcast's cable modem services are telecommunications services and not cable services. The city imposes both a five percent franchise fee on revenue that Comcast derives from cable services and a seven percent license fee on revenue that Comcast derives from cable modem services. Comcast argues that the city's license fee is, in fact, a second "franchise fee" exceeding, and therefore preempted by, the Cable Act's statutory cap.

As framed by the parties, determining whether the license fee is an improper franchise fee turns on the definition of the term "franchise fee" under the Cable Act:

"For the purposes of this section—

"(1)   the term 'franchise fee' includes any tax, fee, or assessment of any kind imposed by a franchising authority or other governmental entity on a cable operator or cable subscriber, or both, solely because of their status as such;

"(2)   the term 'franchise fee' does not include—

"(A)   any tax, fee, or assessment of general applicability (including any such tax, fee, or assessment imposed on both utilities and cable operators or their services but not including a tax, fee, or assessment which is unduly discriminatory against cable operators or cable subscribers)[.]"

47 USC § 542(g).

Comcast then focuses on the definition of the term "cable operator." The Cable Act defines that term to mean:

"[A]ny person or group of persons (A) who provides cable service over a cable system and directly or through one or more affiliates owns a significant interest in such cable system, or (B) who otherwise controls or is responsible for, through any arrangement, the management and operation of such a cable system."

47 USC § 522(5). Comcast argues that its provision of cable modem services was part of its management and operation of its cable system. According to Comcast, a fee imposed on its cable modem services is therefore a fee imposed because of its status as the manager or operator of a cable system and therefore its status as a "cable operator." At least one court has adopted Comcast's argument. *See Comcast Cable of Plano, Inc. v. City of Plano*, 315 SW3d 673, 681 (Tex App 2010) ("There is no dispute that Comcast provided cable service over its cable system, in addition to cable modem service. Thus, we conclude that Comcast's provision of cable modem service over that system was part of its management and operation of the cable system, and therefore part of its activity as a 'cable operator.'").[15]

---

[15]   In addition to *Comcast Cable of Plano*, Comcast also cites to *City of Chicago v. Comcast Cable Holdings, L.L.C.*, 231 Ill 2d 399, 900 NE2d 256 (2008). In that case, a city argued that cable operators breached their cable franchise agreements by failing to pay five percent of the revenue derived from cable modem services. The court held that, following the FCC's classification of cable modem services as noncable services, federal law preempted the enforcement of cable franchise agreements that required paying a portion of revenue derived from cable modem services. In attempting to avoid that conclusion, the city argued

The problem with Comcast's argument—like the analysis in *Comcast Cable of Plano*—is that it fails to account for the phrase "solely because of" in 47 USC § 542(g)(1). Comcast argues only that the license fee is imposed on it for activity it performs as a cable operator. At most, that argument establishes that Comcast is a cable operator and that some applications of the license fee reach cable operators. But the statute requires more. Not all fees imposed on a cable operator are franchise fees. Instead, a fee is a franchise fee if it is imposed on a cable operator solely because of its status as a cable operator. Whether the fee is imposed on a cable operator is a different question from whether the fee is imposed solely because of a company's status as a cable operator.

Comcast errs by focusing on its status as a cable operator rather than focusing on the scope of the license fee. The phrase "solely because of" is used to identify the reason that the fee is imposed on one company rather than another. *See Webster's* at 2168 (defining "solely" as "to the exclusion of alternate or competing things (such as persons, purposes, duties) <done *solely* for money> <a privilege granted *solely* to him> <rely *solely* on oneself>"); *id.* at 194 (defining "because of" as "by reason of : on account of"). A fee is a franchise fee if it is imposed on a company because it is a cable operator and not for any other reason.

The city's license fee does not meet that standard. The license fee is imposed on Comcast because it provides telecommunications services over the city's public rights of way. The relationship between that reason and Comcast's status as a cable operator is only incidental. Although one type of company that may provide telecommunications services is a cable operator, cable operators do not necessarily provide telecommunications services and noncable operators

that the fee—despite being in the franchise agreement—was not a "franchise fee," as that term is defined by 47 USC § 542(g)(1), because it was imposed on cable modem services rather than cable services. The court rejected that argument because the definition of "franchise fee" did not turn on what services it applied to, and instead turned on whether it applied to cable operators "'solely because of their status as such.'" *Comcast Cable Holdings, L.L.C.*, 231 Ill 2d at 412 (quoting 47 USC § 542(g)(1)). The court, however, never addressed whether the fees applied to the cable operator solely because of their status as cable operators, because the city failed to make that argument.

may provide telecommunications services. Whether a company is a cable operator is therefore neither necessary nor sufficient to trigger the license-fee requirement.[16]

We therefore reject Comcast's argument that the license fee is a franchise fee barred by the Cable Act.

## III.   CONCLUSION

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court.

---

[16] Commentators have agreed with this interpretation. *See, e.g.*, 1 *Cable Television and Other Nonbroadcast Video* § 10:25 ("A state or local government may, however, require fair and reasonable compensation from telecommunications providers, including cable operators to the extent that they provide telecommunications services. This compensation power, which is not limited to, say, 5% of revenues, emanates from the authority to manage public rights-of-way.").