EGAN, C. J.
*404 *372 These two cases, which were consolidated for appeal, require us to interpret provisions of the Multnomah County Code ("MCC") that make it unlawful for a person to "permit" a dog to engage in certain dangerous behavior. MCC § 13.305(B). Plaintiffs were cited with Notices of Infraction ("NOIs") alleging violations of MCC § 13.305(B)(10) and (11). A hearings officer affirmed the NOIs. In both cases, plaintiffs filed petitions for writs of review under ORS 34.040, asserting that the hearings officer improperly construed the law in affirming the NOIs. The trial court dismissed both petitions, affirming the hearings officer's orders. We review the trial court's decision for legal error. ORS 34.040 (trial court must allow writ of review "in all cases in which a substantial interest of a plaintiff has been injured" and an inferior court appears to have "[i]mproperly construed the applicable law"); see also City of Eugene v. Comcast of Oregon II, Inc. , 359 Or. 528, 540, 375 P.3d 446 (2016) (determination of the meaning of municipal ordinances is one of law for the court). As explained below, we affirm.
The relevant facts are brief and undisputed. Chucky, plaintiff Jimenez's dog, was "at large" when he attacked and injured one dog, and when he attacked and killed another dog.[1] Cain, plaintiff Carlson's dog, was "at large" when he ran after a child, knocked him down, and aggressively bit him. Jimenez and Carlson each received NOIs stemming from these incidents. Relevant to this appeal are NOIs they each received alleging violations of section 13.305(B)(10) and (11) of the Multnomah County Code,[2] which provide, in relevant part,
*373 "(B) It is unlawful for any person to commit any of the following:
"* * * * *
"(10) Permit any dog to engage in any of the behaviors described in § 13.401(A) or (B);[3 ]
"(11) Permit any dog to engage in any of the behaviors described in § 13.401(C) through (D)[.]"[4]
Plaintiffs timely appealed their NOIs, and each attended a separate hearing before a hearings officer. The hearings officer later summarized the witnesses' testimony. At Jimenez's hearing regarding Chucky, Jimenez stipulated that Chucky was "at large" on the day of the alleged incident. In his testimony at the hearing, Jimenez also stated that his dogs "got out" on that day. Multnomah County Animal Services ("MCAS") Officer Eder testified that shortly after the day of the alleged incident, she went to Jimenez's *405 home five times to inspect Chucky's enclosure, and that each time, it "did not meet the specifications for a secure enclosure/ kennel." After hearing testimony from several additional witnesses, the hearings officer found:
"It is clear from the evidence that Chucky, while at large, attacked and injured [another dog], * * * and therefore engaged in Potentially Dangerous Dog Level 2 behavior as defined in MCC § 13.401(B)."
*374 The hearings officer also found:
"It is clear from the undisputed evidence that Chucky attacked and killed [another dog] * * *. Therefore, I find that the County has proven by a preponderance of the evidence that Chucky, while at large, engaged in Potentially Dangerous Dog Level 4 behavior as defined in MCC § 13.401(D)(1)(b) * * *."
Thus, the hearings officer upheld the NOIs, imposed fines, and suspended Jimenez's ownership of Chucky.
At Carlson's hearing regarding Cain, several witnesses testified. The hearings officer summarized the evidence, and as relevant to the NOI at issue in this case, we recount the following taken from that summary. MCAS Officer Morinville testified that while he was searching for Cain at Carlson's property just after the alleged incident occurred, he "saw a dog jump on a car by the fence and the fence was 'layed down'; therefore the dog had access to the street." Morinville said that "there had been previous reports of dogs loose in the area." Plaintiff Carlson's neighbor also submitted written testimony that "there were many incidents where [Cain and another dog] were out chasing people." Finally, as summarized, plaintiff Carlson testified that he rented the property "from a friend who liked the protective quality" of his dogs and that he lived in a trailer at the back of the property. Carlson described the property as a fenced parking lot with a gate that was secured with a chain bike lock. He said that there was a car located "near the fence" that had dog prints on it, and he described the car as "his dogs' 'stoop.' " Carlson said "[h]e never saw his dogs leave the lot by jumping" from the car over the fence. Carlson admitted that "Cain bit a boy and that Cain was outside of Mr. Carlson's custody and control at the time [of the bite]."
The hearings officer made the following findings:
"It is clear from the evidence Cain was at large[,] * * * ran after [a child], knocked him down and aggressively bit him. Two bystanders had to 'knock the dog off' of [the child]. The evidence, the photos of the injuries, [the child's] crying and saying he was hurt and the statements of the witnesses also support this conclusion.
*375 "* * * * *
"I find that the County has proven beyond a preponderance of the evidence that Cain engaged in Potentially Dangerous Dog Level 4 behavior * * *."
Thus, the hearings officer upheld the NOI. The hearings officer also imposed a fine and suspended Carlson's ownership of Cain.
Plaintiffs each filed a petition in the trial court for a writ of review of the "findings of fact, conclusions, and restrictions" issued by the hearings officer. Plaintiffs also filed briefs in support of their petitions, contending that the hearings officer improperly construed the law in concluding that the infractions had been proven and should be upheld. The trial court entered a general judgment in each case, affirming the hearings officer's determinations regarding the NOIs and dismissing the petitions for writ of review.
On appeal, plaintiffs assert, as they did below, that the hearings officer improperly construed the law and contend that the trial court erred in affirming the hearings officer's decisions. As explained below, although we agree that human conduct is required to establish a violation of the code, we disagree with plaintiffs' assertion that there is no evidence of human conduct in these cases.
We begin our analysis by examining the provisions of the code at issue. The rules that govern the construction of statutes also apply to the construction of local government ordinances, including county code provisions. Comcast , 359 Or. at 540-41, 375 P.3d 446 (applying the rules to municipal ordinances). "We look primarily to the ordinance's *406 text, context, and legislative history, although we may look also to general rules of statutory construction as helpful." Id. (internal brackets and quotation marks omitted).[5] Thus, we set forth the relevant provisions of the Multnomah County Code.
First, MCC § 13.305, the provision under which plaintiffs received their NOIs, provides, in relevant part:
"(A) For the purposes of this section, unless otherwise limited, the owner is ultimately responsible for the *376 behavior of the animal regardless of whether the owner or another member of the owner's household or a household visitor permitted the animal to engage in the behavior that is the subject of the violation.
"(B) It is unlawful for any person to commit any of the following:
"* * * * *
"(10) Permit any dog to engage in any of the behaviors described in § 13.401(A) or (B);
"(11) Permit any dog to engage in any of the behaviors described in § 13.401(C) through (D);
"* * * * *
"(D) Notwithstanding § 13.305(B)(10), (11) and (12), any dog that has been found to have engaged in behaviors as described at §§ 13.401 and 13.402 shall be classified, regardless of whether it is established by preponderance of the evidence that the dog owner, keeper or other person permitted the dog to engage in the behavior . If in any such case it is not established by a preponderance of the evidence that the person cited permitted the dog to engage in the behavior, no fine shall be imposed against that person, but the dog owner or keeper shall be subject to all other restrictions and conditions lawfully imposed by the director or hearings officer pursuant to § 13.404(B) and § 13.509(H) respectively[.]"
(Emphasis added.) Second, MCC § 13.002 provides the following definition:
"PERMIT . For the purpose of § 13.305, shall include human conduct that is intentional, deliberate, careless, inadvertent, or negligent in relationship to an animal."
(Boldface and italics in original.)
To reiterate, plaintiffs contend that, under the plain text of MCC § 13.305(B)(10) and (11), some human conduct by the owner must be proven before the owner may be determined to have violated those provisions. Defendants concede that MCC § 13.305(B) does not provide for strict liability. Nonetheless, defendants contend that MCC § 13.305(B) does not require affirmative action or inaction on the part of the pet owner, because MCC § 13.305(A) provides that "the *377 owner is ultimately responsible" for the behavior of their pets.
We disagree with defendant's reading of the code. Beginning with the text and context of the code, which are the best indications of the code drafters' intent, see Polacek and Polacek , 349 Or. 278, 284, 243 P.3d 1190 (2010), we conclude that plaintiff is correct that the code requires a showing of "human conduct" to establish a code violation. The code explicitly provides that a violation of MCC § 13.305(B) occurs only when an owner "permits" a dog to engage in certain behavior, and that "permit" refers to "human conduct." Furthermore, the code's definition of "permit" contains five specific types of human conduct-ranging from inadvertent to intentional-that subject an owner to liability. The code does not explicitly define "conduct;" therefore, we look to the dictionary for further guidance. See Dept. of Rev. v. Faris , 345 Or. 97, 101, 190 P.3d 364 (2008). Webster's second definition of the noun "conduct" is relevant here:
"2a: the act, manner, or process of carrying out (as a task) or carrying on (as a business, government, or war)."
Webster's Third New Int'l Dictionary 473 (unabridged ed. 2002). Webster's fourth definition of the verb "conduct" is also relevant:
*407 "4: to behave or comport (oneself)."
Webster's at 474.
Those definitions confirm that "human conduct" necessarily involves human behavior or action. Because the code defines the term "permit" by referring to human conduct, the plain text of MCC § 13.305(B)(10) and (11) thus requires that some type of human action or behavior must be present in order to establish a violation.
With that definition and the context of the code provisions in mind, we turn to the statement in MCC § 13.305(A) that pet owners are "ultimately responsible" for the behavior of their animal. That statement does not change the "permit" requirement of MCC § 13.305(B)(10) and (11). Rather, MCC § 13.305(A) expands an owner's liability to cover situations where visitors or household members of the owner *378 "permit" a dog to engage in prohibited behavior. Thus, an owner violates the code if (1) he or she "permits" the dog to engage in prohibited behavior by acting inadvertently, negligently, carelessly, intentionally or deliberately; or (2) a member of the owner's household or household visitor "permits" the behavior. In either case, the code's explicit provision that "permit" refers to "human conduct" remains.
Our conclusion that a human act of "permission" is required to establish a violation under MCC § 13.305(B) (10) and (11) is further supported by MCC § 13.305(D). That section provides for situations where no human has "permitted" a dog's behavior, but a dog has nonetheless engaged in prohibited behavior. In that circumstance, the code provides that the dog may be classified as dangerous, and that restrictions and conditions may be imposed on the owner pursuant to code provisions other than MCC § 13.305(B)(10) and (11). Thus, the code provides explicitly for the circumstance where an owner has not "permitted" a dog to engage in dangerous behavior, yet the dog has done so nonetheless. In that circumstance, the owner may not be penalized under MCC § 13.305(B)(10) or (11), but he or she may face restrictions and conditions imposed under other sections of the code. In sum, MCC § 13.305(B)(10) and (11) require a showing that an owner or other person described in MCC § 13.305(A) permitted the dog to engage in prohibited behavior.
Plaintiffs contend that the hearings officer found no human conduct in this case and that there is "absolutely no evidence demonstrating the requisite human conduct." Specifically, plaintiffs argue there was no evidence that either of them had anything at all to do with or was aware of the animal's "at large" status before the incidents occurred. Therefore, plaintiffs argue that the judgment should be reversed and the NOIs dismissed. We disagree. As we explain below, in these cases, there is evidence to support an inference that plaintiffs did "permit" their dogs' behavior. Therefore, we affirm the judgments.
With regard to plaintiff Jimenez and his dog Chucky, Jimenez did not dispute that Chucky got out of his yard on the day in question. Eder testified that the enclosure was not secure. From that evidence, the hearings officer could *379 reasonably infer that Jimenez "permitted," that is, acted at a minimum inadvertently, in a way that allowed Chucky to engage in dangerous behavior. With regard to plaintiff Carlson and his dog Cain, uncontroverted testimony established that the fence keeping Cain in Carlson's parking lot was "layed down" so that Cain had access to the street. A neighbor testified that Carlson's dogs had gotten out on several previous occasions. Furthermore, Carlson testified that a car was near the fence, that it had paw prints on it, and that the car served as his dogs' "stoop." Carlson also testified that he never personally saw Cain leave the lot by jumping on the car. However, from the factual findings regarding the fence being down, the car being near the fence, and the evidence that the neighbors had reported Cain getting out before, the hearings officer could reasonably infer that Carlson "permitted," that is, acted at a minimum inadvertently, in a way that allowed Cain to engage in dangerous behavior.
Affirmed.

MCC § 13.002 defines an "animal at large" as one "that is not physically restrained on owner's or keeper's premises including motorized vehicles in a manner that physically prevents the animal from leaving the premises or reaching any public areas; or, is not physically restrained when on public property, or any public area, by a leash, tether or other physical control device not to exceed eight feet in length and under the physical control of a capable person."

Jimenez challenges only NOI 59161, which alleged a violation of MCC § 13.305(B)(11), and NOI 59162, which alleged a violation of MCC § 13.305(B)(10). Carlson challenges only NOI 59157, which alleged a violation of MCC § 13.305 (B)(11).

MCC § 13.401(A) and (B) provide:
"(A) Level 1 behavior is established if a dog at large is found to menace, chase, display threatening or aggressive behavior or otherwise threaten or endanger the safety of any person.
"(B) Level 2 behavior is established if a dog, while at large, causes physical injury to any domestic animal."

MCC § 13.401(C) and (D) provide:
"(C) Level 3 behavior is established if a dog, while confined so as not to be at large, * * * aggressively bites any person.
"(D) Level 4 behavior is established if:
"(1) A dog, while at large:
"(a) Aggressively bites any person; or
"(b) Kills or causes the death of any domestic animal or livestock; or
"(2) A dog classified as a Level 3 potentially dangerous dog that repeats the behavior in division (C) of this section after the owner or keeper receives notice of the Level 3 classification."

In this case, neither party presented legislative history and we are unaware of any that would be helpful.